UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PATRIC RUSSELL,

                    Plaintiff,

        v.

WADOT CAPITAL, INC., et al.,

                    Defendants.

CASE NO. C22-0531JLR

ORDER

## I.   INTRODUCTION

Before the court is Defendants WADOT Capital, Inc. ("WADOT"), Erik Egger,
Nicole House, Michael White, Steven White, HMJOINT, LLC ("HMJOINT"), Michele
Chaffee, and Lisa Hallmon's (collectively, the "WADOT Defendants") third motion for
summary judgment.  (MSJ (Dkt. # 88); Reply (Dkt. # 100); Supp. Reply (Dkt. # 109).)
Plaintiff Patric Russell, as administrator and successor of the estate of deceased former
Plaintiff Petra Russell, opposes the motion.  (Resp. (Dkt. # 91); Supp. Resp. (Dkt.
# 104).)  The court has considered the motion, the parties' submissions, the relevant

ORDER - 1

1    portions of the record, and the governing law.  Being fully advised,[1] the court GRANTS

2    IN PART the WADOT Defendants' motion for summary judgment.

3                              **II.      BACKGROUND**

4         This matter arises from two loans that Petra Russell—Mr. Russell's mother and

5    the original plaintiff in this matter—obtained from WADOT in 2018 and 2019.  (*See*

6    *generally* 3d Am. Compl. (Dkt. # 86).)  Mr. Russell alleges that WADOT deceptively

7    issued Ms. Russell "exorbitantly priced and usurious" commercial loans instead of the

8    consumer residential loans that she thought she had obtained.  (Resp. at 2; *see generally*

9    3d Am. Compl.)  The loans were secured by deeds of trust on a home Ms. Russell owned

10   in the Greenwood neighborhood of Seattle, Washington.  (*See* 3/23/23 Egger Decl. (Dkt.

11   # 38) ¶ 19, Ex. N ("1st DOT"); *id.* ¶ 27, Ex. T ("2d DOT").)  When Ms. Russell defaulted

12   on the second loan, WADOT initiated nonjudicial foreclosure proceedings on behalf of

13   Defendants Michael White, Steven White, HMJOINT, Michelle Chaffee, and Lisa

14   Hallmon (together, the "Beneficiaries"), who had purchased the loan from WADOT.

15   (*See id.* ¶¶ 30, 32.)  This lawsuit followed.  The court sets forth the relevant factual and

16   procedural background below.

17   **A.    Factual Background**

18        Ms. Russell owned two residential properties in Seattle, Washington:  (1) the

19   "Greenwood Property" at 146 N. 83rd Street, which she purchased in approximately

20   1977, and (2) the "Ballard Property" at 635 NW 82nd Street, which she purchased in

21

22        ────────────────────

         [1] Neither party requests oral argument and the court concludes that oral argument would not be helpful to its disposition of the motions.  *See* Local Rules W.D. Wash. LCR 7(b)(4)

1    approximately 2004.  (3d Am. Compl. ¶¶ 2.1, 5.7.)  Mr. Russell has lived in the house at

2    the Greenwood Property since he was born in 1991.  (4/29/24 Patric Russell Decl. (Dkt.

3    # 92) ¶¶ 3-4, 6.)  Mr. Russell states that he has special needs and thus relied heavily on

4    his mother, who, he says, "always resided with [him]" at the Greenwood Property, "even

5    though she would also make use of the Ballard Property to give [him] some space" and

6    allow him time to be alone.  (*Id.* ¶¶ 7, 10-13.)

7        In 2014, the law firm Badgley Mullins Turner, PLLC ("BMT") sued Ms. Russell

8    and Mr. Russell for unpaid legal fees incurred in an unrelated lawsuit.  (*See* 4/11/24

9    McIntosh Decl. (Dkt. # 89) ¶ 8, Ex. G at 62-63[2] (email from Ms. Russell).)  In February

10   2016, Ms. Russell testified at trial that she lived at the Ballard Property with Mr. Russell

11   and that the Greenwood Property was "[her] son's house."  (8/10/23 McIntosh Decl.

12   (Dkt. # 65) ¶ 4, Ex. D at 14-16 (excerpts of trial transcript).)  In March 2016, the King

13   County Superior Court entered judgment against the Russells and in favor of BMT for

14   nearly $200,000, plus interest, costs, and attorneys' fees.  (*See* 3/23/23 Egger Decl.

15   ¶¶ 9-10, Ex. E ("1st Title Rep.") at 29.[3])

16       In March 2016, a natural gas explosion (the "Greenwood explosion") destroyed

17   every window at the Greenwood Property.  (*See* 3d Am. Compl. ¶ 5.12; 4/29/24 Patric

18   Russell Decl. ¶¶ 28-32.)  According to Mr. Russell, he and his mother "lost utilities, such

19   as electricity and water" at the Greenwood Property sometime before the explosion "due

20

21       [2] The court refers to the page numbers in the CM/ECF header when citing to the exhibits
     to Mr. McIntosh's declarations.

22       [3] The court refers to the page numbers in the CM/ECF header when citing to the exhibits
     to Mr. Egger's declarations.

1   to [their] financial struggles," which included the BMT lawsuit.  (4/29/24 Patric Russell

2   Decl. ¶¶ 19-21; *see also* 8/10/23 Egger Decl. (Dkt. # 64) ¶ 3, Ex. A (Seattle Public

3   Utilities records showing no water usage or consumption at the Greenwood Property

4   between July 29, 2016 and December 4, 2020); 3/23/23 Egger Decl. ¶ 40, Ex. Z

5   (documents relating to Ms. Russell's February 2020 application to restore electrical

6   service to the Greenwood Property).)  Thus, even before the explosion, the Russells "had

7   to use the Ballard Property," which still had utilities, "to support [Mr. Russell] living at"

8   the Greenwood Property.  (4/29/24 Patric Russell Decl. ¶¶ 21-22, 27.)  After the

9   Greenwood explosion, the Russells boarded up the windows and doors at the Greenwood

10  property and lived at the Ballard Property until they were cleared to return.  (*See id.*

11  ¶¶ 28-32.)  Mr. Russell states that he and his mother returned to the Greenwood Property

12  while it was still boarded up and before utilities were restored because he feels safe there.

13  (*See id.* ¶¶ 33-34 (stating the Russells were "more or less fully back by late 2017"), 35

14  (describing the strategies Mr. Russell used to live at the Greenwood Property while it had

15  no water, sewer, or electricity).)

16      In early 2017, BMT initiated a judicial foreclosure against the Greenwood

17  Property after the Russells failed to pay the judgment owed.  (*See* 3/23/23 McIntosh Decl.

18  (Dkt. # 39) ¶ 3, Ex. B ("Bankruptcy Filings") at 39-40 (stating that a judicial foreclosure

19  had commenced against the Greenwood Property); *see also* 2/7/22 McIntosh Decl. (Dkt.

20  # 3-15) ¶ 3, Ex. B (February 9, 2017 King County Superior Court order allowing BMT to

21  proceed with the sale of "Non-Homestead Real Property"); 3/23/23 Egger Decl. ¶ 9, Ex.

22  E at 29 (noting that a writ of execution had been recorded for the Greenwood Property).)

1        In April 2017, Mr. Russell filed a Chapter 13 bankruptcy petition in which he

2   stated that he lived at the Greenwood Property.  (4/29/24 Patric Russell Decl. ¶¶ 16-17,

3   Ex. 1 at 13.[4])  His bankruptcy case was dismissed when the Russells "later discovered

4   that the petition should have been filed on behalf of" Ms. Russell.  (*Id.* ¶ 17.)  Ms. Russell

5   filed her Chapter 13 bankruptcy petition on June 15, 2017, and amended her schedules

6   later that summer.  (*See generally* Bankruptcy Filings).)  She was represented by counsel

7   in these proceedings.  (*See id.* at 48.)  Ms. Russell stated in her petition and schedules that

8   her residence was the Ballard Property (*id.* at 11, 19, 51, 54) and claimed the Ballard

9   Property as her exempt homestead (*id.* at 25).  She described the Greenwood Property as

10  a "vacant house" (*id.* at 20, 52, 55) and noted that the Greenwood Property secured her

11  debt to BMT (*id.* at 27; *see also id.* at 39 (noting that judicial foreclosure had

12  commenced)).  By signing the filings, Ms. Russell verified under penalty of perjury that

13  the statements therein were true and correct.  (*See id.* at 56.)

14       BMT moved to dismiss Ms. Russell's bankruptcy case in July 2017.  (*See* 3/23/23

15  McIntosh Decl. ¶ 5, Ex. D (Ms. Russell's response to BMT's motion).)  On August 7,

16  2017, the bankruptcy court held a Section 341 meeting of creditors.  (*Id.* ¶ 4, Ex. C

17  ("§ 341 Tr.")); *see* 11 U.S.C. § 341.  Ms. Russell reaffirmed under oath that she resided at

18  the Ballard Property, that she had read all of the documents filed in connection with her

19  petition before signing and filing them, and that all of the information in her filings was

20  true and correct to the best of her knowledge.  (§ 341 Tr. at 4:11-14, 5:20-22, 5:25-6:20.)

21

22       [4] The court refers to the page numbers in the CM/ECF header when citing exhibits to Mr. Russell's declaration.

1    She testified that the Greenwood Property was vacant as a result of the Greenwood

2    explosion and agreed that the Greenwood Property "needs repairs to be able to rent it

3    out." (*Id.* at 50:20-51:11, 51:15-17.)

4           On August 17, 2017, the bankruptcy judge denied BMT's motion to dismiss but

5    granted it relief from the bankruptcy stay to enforce its judgment against the Greenwood

6    Property. (3/23/23 McIntosh Decl. ¶ 6, Ex. E (order denying motion to dismiss).) The

7    court ordered, however, that "no sale of [Ms. Russell's] real property may occur earlier

8    than December 1, 2017." (*Id.* at 78.) BMT eventually set the sale of the Greenwood

9    Property to take place on January 12, 2018. (*See* 3/23/23 Egger Decl. ¶ 14, Ex. I.)

10          1.    Ms. Russell's First Loan

11          In late 2017, Ms. Russell contacted Defendant Todd Lindstrom Corporation, doing

12   business as Capital Compete ("Capital Compete"), about obtaining a loan. (*See id.* ¶ 4.)

13   On November 10, 2017, Capital Compete forwarded to WADOT a loan summary stating

14   that the collateral for the loan was the Greenwood Property and that the purpose of the

15   loan was "minor home repairs to get it rented and interest reserves." (*Id.* ¶ 4, Ex. A ("1st

16   Loan Summary") at 11.) According to WADOT's founder and president, Erik Egger,

17   "WADOT provides collateral-based loans solely for business or commercial purposes in

18   Washington, Oregon[,] and Idaho." (*Id.* ¶ 3.) Mr. Egger represents that "WADOT does

19   not make loans for consumer purposes and does not accept as security a borrower's

20   residence." (*Id.*)

21          On November 15, 2017, Ms. Russell sent Capital Compete an email in which she

22   stated that the Greenwood Property was subject to a $250,000 lien for BMT's attorney's

1   fees, that the purpose of the refinance was "need to repair the house," and that "after she

2   [paid] off this $250,000 deadline this month and [made] improvement[s] she c[ould] rent

3   out the house." (4/11/24 McIntosh Decl. ¶ 8, Ex. G at 62-63.[5])

4           On November 16, 2017, Capital Compete sent WADOT a completed Uniform

5   Residential Loan Application signed by Ms. Russell. (3/23/23 Egger Decl. ¶ 6, Ex. B

6   ("1st Loan App.").) On her application, Ms. Russell represented that the Greenwood

7   Property was an investment property (rather than her primary or secondary residence),

8   that the purpose of the loan was "need to repair the house," and that the Ballard Property

9   was her current address. (*Id.* at 13.) By signing the application, Ms. Russell represented

10  under penalty of perjury that the information therein was "true and correct." (*Id.* at 15.)

11          On November 20, 2017, WADOT ran a credit report for Ms. Russell. (*Id.* ¶ 7.)

12  The report listed the Ballard Property as Ms. Russell's current address and noted that Ms.

13  Russell had a pending bankruptcy petition. (*Id.* ¶ 7, Ex. D at 19, 21.) The report also

14  listed the Greenwood Property as one of Ms. Russell's addresses. (*Id.* at 23.)

15          On November 21, 2017, Capital Compete sent WADOT a preliminary title report

16  for the Greenwood Property. (*Id.* ¶ 9.) The report listed the following exceptions to any

17  title insurance policy issued on the Greenwood Property: (1) delinquent property taxes;

18  (2) BMT's judgment lien for $197,995.46 against the Russells in a "commercial" action;

19

20

21          [5] Mr. Russell asserts that the "original version of [this] statement" did not include the
    phrase "she can rent out the house." (Resp. at 8 (citing 4/29/24 Davidovskiy Decl. ¶ 8, Ex. 7).)
    The evidence offered to support this assertion, however, bears no indication of when or by whom

22  it was written. (*See* 4/29/24 Davidovskiy Decl., Ex. 7.)

1  (3) BMT's writ of execution of the judgment; and (4) the bankruptcy judge's ruling that

2  BMT could proceed with the sale of the Greenwood Property.  (1st Title Rep. at 28-30.)

3  On November 27, 2017, WADOT conditionally approved Ms. Russell for a

4  commercial loan "[b]ecause all of the information [she] provided to WADOT . . .

5  consistently stated that the purpose of [her] loan was to repair and maintain investment

6  rental property that she did not live in."  (3/23/23 Egger Decl. ¶ 11; *see also id.*, Ex. F

7  ("1st Cond'l App.").)  The conditional loan approval, signed by Ms. Russell, stated that

8  the approval "assume[d] business/investment use" of the funds borrowed.  (1st Cond'l

9  App. at 35.)

10  Also on November 27, 2017, Ms. Russell moved, through counsel, to dismiss her

11  Chapter 13 bankruptcy case.  (*See* 3/23/23 McIntosh Decl. ¶ 7, Ex. F (December 6, 2021

12  letter from WADOT's attorney to Ms. Russell's attorney ("12/6/21 Letter")), at 101-02

13  ("11/27/17 Petra Russell Decl.").)  In a declaration accompanying her motion, she stated:

14  > I desire dismissal of my Chapter 13 case because I have applied for
15  > financing . . . as an alternative to Chapter 13 bankruptcy.  The new proposed
16  > loan would be taken out with the intention of paying off the claims that I was
   > otherwise paying through my Chapter 13 plan, specifically the judgment lien
16  > of [BMT]; the back-owed real estate taxes; and [fees accrued in the
   > bankruptcy proceeding].  As a condition of financing, the lender is requiring
17  > that the bankruptcy case be dismissed before closing on the loan.  The new
   > loan will buy me additional time in which to apply for funds to replace the
18  > doors and windows and otherwise rehabilitate the property.

19  (*Id.*)  WADOT's conditional loan approval was attached to the declaration.  (*Id.*)  The

20  bankruptcy court granted the motion to dismiss.  (2/7/22 McIntosh Decl. ¶ 9, Ex. G.)

21  On December 22, 2017, Christopher Leighton of WADOT inspected the exterior

22  of the Greenwood Property.  (Leighton Decl. (Dkt. # 90) ¶¶ 2-3.)  According to Mr.

1   Leighton, Ms. Russell did not want him to enter the property because it had been boarded

2   up since the 2016 Greenwood explosion.  (*Id.* ¶ 3.)  The inspection revealed that "the

3   windows and doors were all boarded up and the power was turned off."  (*Id.*; *see also*

4   3/23/23 Egger Decl. ¶ 12, Ex. G (photos of the property).)  He concluded that the

5   property was vacant.  (*See* 3/23/23 Egger Decl. ¶ 12.)  Mr. Russell, however, states that

6   he and Ms. Russell were "more or less fully back" at the Greenwood Property before Mr.

7   Leighton came to inspect the home.  (4/29/24 Patric Russell Decl. ¶¶ 33, 37.)

8        On January 4, 2018, Capital Compete provided WADOT a copy of Ms. Russell's

9   proof of insurance for the Greenwood Property.  (3/23/23 Egger Decl. ¶ 13, Ex. H ("1st

10   Ins. Proof") at 41-42.)  The proof of insurance stated that the policy was a "rental

11   dwelling" policy that included coverage for business liability and loss of rents and

12   identified the Ballard Property as Ms. Russell's mailing address.  (*Id.*)  Capital Compete

13   also forwarded to WADOT an email from Ms. Russell regarding her insurance

14   information and plan for repairing the Greenwood Property.  (*Id.* ¶ 14, Ex. I.)

15        On January 9, 2018, Ms. Russell signed the following documents to close the loan:

16   (1) a letter stating that "[t]he intent of this loan is for investment purposes" and that she

17   "plan[ned] to pay off the loan through a refinance or sale of the property prior to the

18   expiration of the loan" (*id.* ¶ 15, Ex. J ("1st Business Letter")); (2) a W-9 form listing her

19   address as the Ballard Property (*id.* ¶ 16, Ex. K ("W-9")); (3) a loan agreement stating

20   that "[t]he Indebtedness . . . is ***not*** to be used for personal, family or household purposes"

21   and listing Ms. Russell's address as the Ballard Property (*id.* ¶ 17, Ex. L ("1st Loan

22   Agreement") at 49, 54); (4) a promissory note in which Ms. Russell "represent[ed] and

ORDER - 9

warrant[ed]" to WADOT that the "sums represented by this Promissory Note are being used for business, investment or commercial purposes, and not for personal, family or household purposes" (*id.* ¶ 18, Ex. M ("1st Note") at 58); and (5) a deed of trust encumbering the Greenwood Property, in which she "represent[ed] and warrant[ed]" that "the loan secured by this Deed of Trust was not made primarily for personal, family or household purposes" (1st DOT at 62).  WADOT funded the $350,000 loan on January 11, 2018.  (*See id.* ¶ 20, Ex. O (final settlement statement).)

In August 2018, Ms. Russell requested, through Capital Compete, payment of $10,000 in construction holdback funds that WADOT had retained from the loan pending the completion of deferred maintenance on the Greenwood Property.  (*See id.* ¶ 21, Ex. P at 74; *see also* Leighton Decl. ¶ 4.)  Ms. Russell again refused WADOT's request to inspect the interior of the property in connection with the holdback.  (Leighton Decl. ¶ 4.)  Mr. Leighton, however, "could see from the outside that the windows had been replaced and were no longer boarded up."  (*Id.*)  As a result, WADOT paid Ms. Russell the construction holdback funds.  (*Id.*)

2.     Ms. Russell's second loan

In November 2018, Ms. Russell contacted Capital Compete about refinancing her first loan.  (*See* 4/11/24 McIntosh Decl. ¶ 4, Ex. C (late 2018 emails between Ms. Russell and Capital Compete).)  Capital Compete reached out to five lenders and obtained a conditional approval for a 30-year loan from Velocity Mortgage Capital ("Velocity").  (*See id.* ¶ 2, Ex. A (November 2018 emails from Capital Compete to lenders); *id.* ¶ 3, Ex.

B (November 2018 emails and documents related to the Velocity loan); *id.* at 19-22

(Velocity's conditional approval).)

Capital Compete forwarded Velocity's conditional loan approval to Ms. Russell.

(*See id.* ¶ 4, Ex. C at 23.)  On November 20, 2018, Ms. Russell sent Capital Compete an

email in which she asked if she could "borrow from Wadot again since they know [her],"

stated that she was "not comfortable to take this loan as a business loan," and asked if

Capital Compete could get her a better loan.  (*Id.* at 24.)  Capital Compete responded, in

relevant part:

> In private money lending, they are all considered 'business loans'.  Your loan
> with WADOT was also considered a business loan.  This is because the
> property is an investment property and not used for your personal residence.
> Their [sic] are restrictions against using these types of loans for your primary
> residence.  This is why the loan must be considered a business loan.

(*Id.* at 25.)  Capital Compete also warned Ms. Russell that WADOT did not have a "long

term program" loan like the one Velocity was offering.  (*Id.*)  Ms. Russell thanked

Capital Compete for the answers, and stated that she would "consider to go with Wadot

again."  (*Id.* at 25-26.)

In an email on November 23, 2018, Ms. Russell told Capital Compete that she

hoped they could "help [her] feel comfortable" about the Velocity loan.  (*Id.* at 27.)

Capital Compete asked what would make her feel comfortable.  (*Id.*)  It informed her that

it "do[es] not do conventional lending" but instead did "private money loans that

eliminates [sic] much of the paperwork and guidelines that a conventional bank would

require."  (*Id.*)  Ms. Russell wrote that she would be comfortable if the loan did not

charge for prepayment and that she did "not wish to sign off foregoing certain protections

for consumer [sic]." (*Id.* at 28.)  Capital Compete replied that Ms. Russell was "not

giving up any consumer rights" and asked if she wanted to move forward with the

Velocity loan.  (*Id.*)  By December 2018, Ms. Russell had decided against the Velocity

loan in favor of borrowing again from WADOT.  (*Id.* at 29-30; *see also id.* ¶ 5, Ex. D

(emails regarding second loan and inspection).)

On December 26, 2018, Mr. Leighton met Ms. Russell at the Greenwood Property

to perform an inspection in connection with the second loan.  (Leighton Decl. ¶ 5;

3/23/23 Egger Decl. ¶ 24.)  Mr. Russell was also present.  (4/29/24 Patric Russell Decl.

¶ 37.)  Mr. Leighton observed that "[t]he windows were all open and it was freezing cold

inside," "[t]here was furniture and other things inside that looked like belongings left

behind or that were being stored there," and "there was no heat, no power, the power

meter was gone, and [there were] no apparent utility services."  (Leighton Decl. ¶¶ 6-8.)

He also observed that there were "some rooms decorated for Christmas."  (*Id.* ¶ 8, Ex. A

(email from Mr. Leighton to Todd Lindstrom of Capital Compete); *see also id.* ¶ 9, Ex. B

(photos from the inspection).)  He concluded that the property was vacant because "no

one was living there."  (*Id.* ¶ 8.)  Mr. Russell, however, asserts that he and his mother

were "continuing to use the Greenwood Home as [their] residence through 2018."

(4/29/24 Patric Russell Decl. ¶ 37.)  He states that Mr. Leighton's inspection of the

Greenwood Property was only cursory and that Mr. Leighton did not "bother" to inspect

"the downstairs kitchen, the upstairs master bedroom, or even the basement."  (*Id.*)

The parties re-used Ms. Russell's first loan application for her second loan.

(*Compare* 1st Loan App; *with* 8/10/23 Egger Decl. ¶ 4, Ex. B at 19-22 ("2d Loan App.")

1   (adding new signatures dated January 15, 2019, above the November 2017 signatures).)

2   Ms. Russell again obtained a rental dwelling insurance policy for the Greenwood

3   Property.  (*See* 3/23/23 Egger Decl. ¶ 23, Ex. Q ("2d Ins. Proof").)

4          At closing, Ms. Russell executed the following documents:  (1) a loan agreement

5   stating that "[t]he Indebtedness. . . is *not* to be used for personal, family or household

6   purposes" and listing her address as the Ballard Property (*id.* ¶ 25, Ex. R ("2d Loan

7   Agreement") at 80, 85); (2) a promissory note in which she "represent[ed] and

8   warrant[ed]" to WADOT that the "sums represented by this Promissory Note are being

9   used for business, investment or commercial purposes, and not for personal, family or

10  household purposes" (*id.* ¶ 26, Ex. S ("2d Note") at 89); and (3) a deed of trust that

11  encumbered the Greenwood Property and warranted that "the loan secured by this Deed

12  of Trust was not made primarily for personal, family or household purposes" (2d DOT at

13  93).  She also signed an interest reserve holdback agreement pursuant to which WADOT

14  would hold back certain loan proceeds and apply them to the monthly interest payments

15  due under the second loan.  (3/23/23 Egger Decl. ¶ 28, Ex. U.)  WADOT funded the

16  $443,000 second loan on January 16, 2019.  (*See id.* ¶ 29, Ex. V (final settlement

17  statement).)  The proceeds of paid off the balance of the first loan, along with property

18  taxes, closing costs, and the interest reserve holdback.  (*Id.*)

19          3.     Foreclosure Actions

20          On January 25, 2019, WADOT sold the second loan to the Beneficiaries, and

21  recorded an assignment of the second deed of trust shortly thereafter.  (*See* 3/23/23 Egger

22  Decl. ¶ 30, Ex. W (assignment of 2d DOT).)  WADOT continued to service the loan after

1   assigning it to the Beneficiaries and applied the interest holdback to the interest-only

2   payments due on the loan.  (*Id.* ¶¶ 31-32.)  Ms. Russell failed, however, to pay off the

3   balance of the second loan before it matured on February 1, 2020.  (*Id.* ¶ 32.)  As a result,

4   WADOT initiated nonjudicial foreclosure proceedings on behalf of the Beneficiaries and

5   appointed Defendant NCW Trustee Services, LLC ("NCW") as successor trustee.  (*Id.*

6   ¶¶ 32-33, Ex. X.)  On April 1, 2021, NCW recorded a notice of trustee's sale that set the

7   sale of the Greenwood Property on July 30, 2021.  (*See* 3d Am. Compl. ¶ 5.66.)  This sale

8   was later discontinued.  (*See id.* ¶ 5.68.)

9        In September 2021, WADOT initiated a second nonjudicial foreclosure attempt

10   and set the sale of the Greenwood Property on February 11, 2022.  (*See id.* ¶ 5.1; 3/23/23

11   Egger Decl. ¶ 34; *see also id.*, Ex. Y (beneficiary declaration).)  Ms. Russell's attorney

12   demanded that WADOT rescind the second loan under the Truth in Lending Act

13   ("TILA"), 15 U.S.C. § 1601 *et seq.*  (*See* 12/6/21 Letter at 79.)  WADOT responded that

14   recission under TILA was not available because the loan was for a business purpose and

15   refused to cancel the February 11, 2022 trustee's sale.  (*Id.* at 79-81.)

16        4.   Proceedings in state court

17        Ms. Russell filed her original complaint in King County Superior Court on

18   January 31, 2022, and amended the complaint in March 2022.  (*See* Not. of Removal

19   (Dkt. # 1) ¶ 1; Am. Compl. (Dkt. # 1-1).)  She challenged the terms of her WADOT

20   loans; sought to enjoin the foreclosure sale of the Greenwood Property; and alleged

21   claims under state and federal law against the WADOT Defendants, Capital Compete and

22   its governing persons, and NCW.  (*See generally* Am. Compl.)  On February 8, 2022, the

1  superior court granted Ms. Russell's motion for a temporary restraining order and

2  enjoined the sale of the Greenwood Property.  (*See* TRO Order (Dkt. # 3-33).)  On March

3  11, 2022, the superior court granted Ms. Russell's motion for a preliminary injunction

4  enjoining the sale.  (PI Order (Dkt. # 3-55).)  That preliminary injunction remains in

5  place.

6  **B.   Procedural Background**

7         On April 20, 2022, HMJOINT removed the action to this court.  (*See generally*

8  Not. of Removal.)  On October 26, 2022, Ms. Russell amended her complaint to add

9  claims against Defendant National Capital Partners, Inc. ("NCP") and its principal Jared

10  Ekdahl (together, the "NCP Defendants").  (2d Am. Compl. (Dkt. # 31).)

11        The WADOT Defendants filed their first motion for summary judgment on March

12  23, 2023.  (1st MSJ (Dkt. # 37).)  The court denied the motion without prejudice and

13  granted Ms. Russell leave to conduct limited discovery pursuant to Federal Rule of Civil

14  Procedure 56(d).  (*See generally* 5/10/23 Order (Dkt. # 49).)  The WADOT Defendants

15  filed their second motion for summary judgment after Ms. Russell's limited discovery

16  deadline expired.  (2d MSJ (Dkt. # 63).)

17        On August 24, 2023, the court extended the briefing schedule for the second

18  motion for summary judgment because Ms. Russell had suffered a stroke.  (*See* 8/24/24

19  Order (Dkt. # 71).)  Shortly thereafter, Ms. Russell moved to further amend her complaint

20  to, in relevant part, incorporate her retained expert's report.  (*See* Mot. to Amend (Dkt.

21  # 72); Prop. 3d Am. Compl. (Dkt. # 72-2).)  The court received notice of Ms. Russell's

22  death while it was finalizing its order denying the motion to amend.  (*See generally*

1   9/21/23 Order (Dkt. # 77).)  The court then stayed this matter to allow time for Ms.

2   Russell's heirs to consult counsel and consider how to proceed.  (*See* 9/21/23 Min. Order

3   (Dkt. # 78); 11/20/23 Min. Order (Dkt. # 81).)

4        After Mr. Russell substituted in as Plaintiff in January 2024, the court entered an

5   amended pretrial schedule and granted Mr. Russell leave to file a third amended

6   complaint naming Mr. Russell as Plaintiff.  (*See* 1/9/24 Order (Dkt. # 84) (granting Mr.

7   Russell's motion to substitute); 1/24/24 Order (Dkt. # 87) (setting pretrial schedule).)

8        The WADOT Defendants filed the instant motion for summary judgment on April

9   11, 2024.  (MSJ.)  They argued, in part, that statements Ms. Russell made in the verified

10  complaints and declarations she filed before her death are now inadmissible hearsay.  (*Id.*

11  at 10.)  In response, Mr. Russell asserted that Ms. Russell's statements were admissible

12  under Federal Rule of Evidence 801(d)(2).  (*See* Resp. at 5 n.20; *see generally id.* (citing

13  Compl.; 2d Am. Compl.; Petra Russell Decls. (Dkt. ## 3-27, 3-31, 3-38, 3-48, 44)).)

14       On May 7, 2024, the court issued an order in which it agreed with the WADOT

15  Defendants that statements Ms. Russell made in her verified complaints and declarations

16  are hearsay and thus inadmissible at summary judgment if offered by Mr. Russell unless

17  a hearsay exception applies.  (5/7/24 Order (Dkt. # 101) at 2 (citing *Carroll v. Ladah L.*

18  *Firm PLLC*, No. 2:18-CV-960 JCM (BNW), 2024 WL 709224, at *2 (D. Nev. Feb. 20,

19  2024); Fed. R. Civ. P. 56(c); Fed. R. Evid. 801(c), 802).)  The court held that Rule

20  801(d)(2), under which a party's out-of-court statement is not hearsay if it is offered

21  *against* that party, does not allow Mr. Russell to offer Ms. Russell's statements *in support*

22  *of* the estate's claims.  (*Id.* at 3 (quoting Fed. R. Evid. 801(d)(2)).)  Thus, the court

1   ordered Mr. Russell to file a supplemental brief (1) addressing whether Ms. Russell's

2   statements were admissible under any hearsay exception and (2) responding to the motion

3   for summary judgment without relying on Ms. Russell's hearsay statements.  (*Id.*)  The

4   court warned Mr. Russell that it would not consider arguments that he purported to

5   incorporate by reference from Ms. Russell's earlier filings.  (*Id.* at 3 n.1; *see* Resp. at 2

6   n.1 (purporting to incorporate by reference nearly a dozen filings).)  Finally, the court

7   stayed briefing on motions for summary judgment filed by the NCP Defendants and by

8   the Todd Lindstrom Corp., Todd Lindstrom, and Tia Lindstrom (the "Lindstrom

9   Defendants") pending its ruling on the WADOT Defendants' motion.  (5/7/24 Order at 4

10  (citing NCP MSJ (Dkt. # 94); Lindstrom MSJ (Dkt. # 96)).)

11          Mr. Russell and the WADOT Defendants timely filed supplemental briefs in

12  accordance with the court's May 7, 2024 order.  (*See* Supp. Resp.; Supp. Reply.)  The

13  motion is now ripe for decision.

14                        **III.    ANALYSIS**

15          The court begins by addressing two evidentiary matters before turning to the

16  merits of the WADOT Defendants' motion for summary judgment.

17  **A.    Evidentiary Matters**

18          Below, the court considers whether two forms of evidence are admissible to

19  support Mr. Russell's response to the WADOT Defendants' motion:  (1) statements Ms.

20  Russell made in her declarations and verified complaints and (2) the expert report of Mr.

21  Russell's retained expert, Randall Lowell.

22

1        1.      Admissibility of Ms. Russell's Prior Statements

2        The WADOT Defendants assert that the court cannot consider statements Ms.

3   Russell made in her declarations and verified complaints in deciding their motion because

4   those statements are inadmissible hearsay.  (MSJ at 10.)  In its May 7, 2024 order, the

5   court held that Ms. Russell's statements are hearsay if offered for the truth of the matter

6   asserted therein and rejected Mr. Russell's argument that the statements are admissible if

7   offered in support of his case under Rule 801(d)(2).[6]  (5/7/24 Order at 3.)  Mr. Russell

8   now raises several new arguments to support his use of Ms. Russell's statements in

9   opposing summary judgment.  None are persuasive.[7]

10       First, Mr. Russell argues that Ms. Russell's statements "regarding the subject

11  transactions and the making of the loan agreements" are not hearsay at all because they

12  have "legal significance independent of [their] truth" and are "analogous to verbal acts."

13  (Supp. Resp. at 2.)  Specifically, he contends that:

14           evidence of Ms. Russell's oral representations regarding the non-business
             purpose [of the loans] and the Greenwood Home being her principal dwelling
15           as well as her intent to occupy it as such are not subject to the hearsay rule
             because such evidence pertains to the existence of the terms of the
16           transactions and the effect on the listener rather than an assertion of their
             "truth."

17

18

19

             ───────────────────────
20           [6] Ms. Russell's statements are admissible under Rule 801(d)(2) if offered by Defendants.
     *See, e.g.*, *Est. of Shafer v. C.I.R.*, 749 F.2d 1216, 1220 (6th Cir. 1984) (statements attributed to
             decedent can be offered by the opposing party when the decedent's estate is a party in the case).

21           [7] Mr. Russell must overcome two levels of hearsay for the statements to be admissible:
     the statement Ms. Russell allegedly made to WADOT or Capital Compete and the statement in
22   Ms. Russell's declaration or complaint recounting what she said.  *See* Fed. R. Evid. 805.

1    (*Id.* at 3.)  Mr. Russell is wrong.  A verbal act is a statement whose significance "lies

2    *solely* in the fact that it was made."  Fed. R. Evid. 801(c) advisory committee note

3    (emphasis added).  Here, Mr. Russell asks the court to accept as true Ms. Russell's

4    statements that she told WADOT and Capital Compete that she sought the loans for a

5    non-business purpose and that the Greenwood Property was her primary residence.

6    Because Ms. Russell cannot testify about those statements in court, the statements are

7    hearsay and cannot be admitted absent an exception.  Fed. R. Civ. P. 801(c); *see Am. Fid.*

8    *Assurance Co. v. Salter*, No. 4:18-CV-05152-SAB, 2020 WL 1918099, at *4 (E.D. Wash.

9    Mar. 2, 2020) (concluding that statements in decedent's declaration that purported to

10   explain how decedent intended to divide policy proceeds were inadmissible hearsay

11   because they were introduced for their truth).

12          Second, Mr. Russell contends that Ms. Russell's statements are admissible under

13   Rule 807's residual hearsay exception.  (Supp. Resp. at 3.)  Under Rule 807, a statement

14   may be excluded from the hearsay rule if (1) "the statement is supported by sufficient

15   guarantees of trustworthiness—after considering the totality of circumstances under

16   which it was made and evidence, if any, corroborating the statement" and (2) "it is more

17   probative on the point for which it is offered than any other evidence obtained through

18   reasonable efforts."  Fed. R. Evid. 807(a).

19          The court concludes that the residual exception does not apply here because Ms.

20   Russell's statements in her declarations and verified complaints about the purpose of her

21   loans and what she told WADOT and Capital Compete when she applied for them are not

22   supported by sufficient guarantees of trustworthiness.  In *United States v. Sanchez-Lima*,

1    for example, the Ninth Circuit concluded that certain videotaped statements of

2    eyewitnesses in Mexico

> possessed guarantees of trustworthiness because the declarants (1) were
> under oath and subject to the penalty of perjury; (2) made the statements
> voluntarily; (3) based the statements on facts within their own personal
> knowledge; (4) did not contradict any of their previous statements to
> government agents and defense investigators; and (5) had their testimony
> preserved on videotape which would allow the jurors an opportunity to view
> their demeanor.

7    161 F.3d 545, 547 (9th Cir. 1998).  Here, by contrast, Mr. Russell seeks to admit Ms.

8    Russell's statements to contradict statements she made, often under penalty of perjury, in

9    her bankruptcy petitions, the Section 341 hearing, her loan applications, the promissory

10   notes, and the deeds of trust.  None of the statements Mr. Russell asks the court to

11   consider were videotaped or otherwise preserved in a way that would enable the jury to

12   evaluate her demeanor.  Furthermore, she made the statements in her verified complaints

13   and declarations at least three years after her second loan closed.  (See 3/23/23 Egger

14   Decl. ¶ 29 (noting the second loan closed in 2019); see, e.g., United States v. Bruguier,

15   961 F.3d 1031, 1033 (8th Cir. 2020) (finding a statement made nine months after the

16   incidents at issue was not "particularly worthy of belief" and declining to apply the

17   residual exception).  She also admitted in at least one of those statements that her

18   memory was not good.  (See 4/21/23 Petra Russell Decl. (Dkt. # 44) ¶ 9.)  Accordingly,

19   the court concludes that the statements are not admissible under Rule 807.

20        Third, Mr. Russell asserts that his mother's "statements regarding her intent to use

21   the loan for non-business purposes and to occupy the Greenwood Home as her primary

22   residence are admissible under [Rule] 803(3) as [evidence of] her then-existing state of

ORDER - 20

mind." (Supp. Resp. at 7-8.)  Rule 803 provides that "[a] statement of the declarant's

then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or

physical condition (such as mental feeling, pain, or bodily health)" is admissible

regardless of the availability of the declarant.  Fed. R. Evid. 803(3).  "[A] statement of

memory or belief to prove the fact remembered or believed," however, is not admissible

"unless it relates to the validity or terms of the declarant's will."  *Id.*  For example, the

Ninth Circuit held when a witness testified, "I never intended on going to a camp," that

statement expressed his memory of his state of mind in the past and thus was not

admissible to prove that he in fact did not intend to go to a camp at the relevant time.

*United States v. Hayat*, 710 F.3d 875, 895-96 (9th Cir. 2013).  Here, too, the statements

Mr. Russell seeks to admit reflect Ms. Russell's memory or belief in 2022 and 2023

about what she did or said between 2016 and 2019.  As a result, those statements are not

admissible under Rule 803(3) to prove that Ms. Russell intended to enter into personal

loans rather than business loans in 2017, 2018, and 2019.

Finally, Mr. Russell's supplemental declaration cannot render Ms. Russell's

hearsay statements admissible.  Mr. Russell states that he reviewed Ms. Russell's

declarations and verified complaints and "certif[ies] that the facts and allegations

contained in [her] statements are true and correct to the best of [his] knowledge,

information, and belief," and that he "would reaffirm and restate these facts and

allegations in any trial or proceeding." (5/31/24 Patric Russell Decl. (Dkt. # 105) ¶¶ 3-4.)

Mr. Russell, however, has not shown that he can testify from his own personal

knowledge about the statements and representations his mother made to WADOT and

1  Capital Compete while procuring her loans.  (*See generally id.*)  Thus, his supplemental

2  declaration will not help him circumvent the hearsay rule.  The court concludes that Ms.

3  Russell's statements in her declarations and verified complaints are inadmissible at

4  summary judgment if offered by Mr. Russell for the truth of the matters set forth therein.

5      2.  Mr. Lowell's Expert Report

6      Assuming, without deciding, that Mr. Lowell's expert report is properly before the

7  court,[8] the court finds that the report is "replete with legal conclusions" that the court

8  consider at summary judgment.  *See Sundby v. Marquee Funding Grp., Inc.*, No.

9  3:19-CV-0390-GPC-AHG, 2020 WL 5535357, at *7 (S.D. Cal. Sept. 15, 2020), *vacated*

10  *on other grounds by* Nos. 21-55504, 21-55582, 2022 WL 4826445 (9th Cir. Oct. 3,

11  2022).  As a general rule, "an expert witness cannot give an opinion as to her *legal*

12  *conclusion*, i.e., an opinion on an ultimate issue of law."  *Nationwide Transp. Fin. v. Cass*

13  *Info. Sys. Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (quoting *Hangarter v. Provident Life*

14  *& Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)) (internal citations and quotation

15  marks omitted); *see also United States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015)

16  ("[A]n expert cannot testify to a matter of law amounting to a legal conclusion.").  This is

17  because "[r]esolving doubtful questions of law is the distinct and exclusive province of

18

19      [8] The report is in the record only as an exhibit to Ms. Russell's redlined proposed third
20  amended complaint, which she filed in support of her motion to amend.  (*See* Prop. 3d Am.
    Compl. at 244-314 ("Lowell Report").)  Because the court denied that motion (*see* 9/21/23
21  Order), the report was never part of an operative complaint.  The report also is not accompanied
    by a declaration attesting to its authenticity.  *See, e.g.*, *Scott v. Edinburg*, 346 F.3d 752, 759 (7th
22  Cir. 2003) (concluding expert report could not be considered at summary judgment where it
    "was introduced into the record without any supporting affidavit verifying its authenticity").

1    the trial judge." *Nationwide Transp. Fin.*, 523 F.3d at 1058 (quoting *United States v.*

2    *Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993)); *see also id.* at 1059-60 (concluding that

3    the district court did not abuse its discretion when it prohibited an expert from testifying

4    about how a statute applied to the facts of the case).

5          In *Sundby v. Marquee Funding Group*, for example, the defendant's expert

6    witness offered opinions that the loans at issue in the case were "exempt from" certain

7    provisions of TILA; that a borrower "can only have one primary residence" within the

8    meaning of TILA; and that one of the loans was a "business purpose loan" under the

9    relevant regulations.  2020 WL 5535357, at *7.  The district court determined that "each

10   of these conclusions is impermissible because it amounts to an interpretation of a contract

11   (i.e., the loan documents) or the applicability of a statute (e.g., TILA, its corresponding

12   regulations, and various state laws)." *Id.* (compiling cases so holding).  The court

13   observed that, rather than "define terms of a 'technical nature' . . . or provide information

14   on industry standards or practice," the report "instead purport[ed] to define terms which

15   have a 'specialized meaning' in the context of TILA, including a 'bridge loan' or a

16   'commercial purpose' loan, and to instruct the the reader on 'how to apply the law to the

17   facts of the case.'" *Id.* (quoting *United States v. Diaz*, 876 F.3d 1194, 1199 (9th Cir.

18   2017)).  Accordingly, the *Sundby* court declined to consider the expert's "impermissible

19   legal conclusions" in ruling on the motions for summary judgment before it.  *Id.*

20         Like the expert in *Sundby*, Mr. Lowell repeatedly applies statutes and regulations

21   to the facts of this case to arrive at legal conclusions.  (*See, e.g.*, Lowell Report at 9

22   (opining that Ms. Russell made an "application for credit secured by a first lien on a

1    dwelling" under the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*),

2    14-15 (opining that Ms. Russell's loans were consumer loans to which TILA applies),

3    18-19 (opining that Ms. Russell's loans were not business purpose loans and thus

4    Washington's usury law applies), 21 (concluding that Ms. Russell "should be entitled to a

5    recission under TILA"), 22 (opining that the loan "was not a commercial loan" and

6    "appears to be usurious"), 60-61 (opining that Capital Compete was acting "both as

7    broker and agent" for WADOT).)  Because such opinions purport to interpret Ms.

8    Russell's loan documents and apply the law to the facts of the case, the court concludes

9    that they are impermissible legal conclusions and does not consider them.

10   **B.      Motion for Summary Judgment**

11        Having resolved that it will not consider Ms. Russell's hearsay statements and Mr.

12   Lowell's legal conclusions in evaluating the WADOT Defendants' motion for summary

13   judgment, the court now turns to the merits of that motion.

14        1.    Standard of Review

15        Summary judgment is appropriate if the evidence viewed in the light most

16   favorable to the non-moving party shows "that there is no genuine dispute as to any

17   material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

18   56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when,

19   under the governing substantive law, it could affect the outcome of the case.  *Anderson v.*

20   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists

21   when "the evidence is such that a reasonable jury could return a verdict for the

22   nonmoving party."  *Id*.  "Disputes over irrelevant or unnecessary facts will not preclude a

1    grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809

2    F.2d 626, 630 (9th Cir. 1987).

3          To carry its burden, "the moving party must either produce evidence negating an

4    essential element of the nonmoving party's claim or defense or show that the nonmoving

5    party does not have enough evidence of an essential element to carry its ultimate burden

6    of persuasion at trial." *Jones v. Williams*, 791 F.3d 1023, 1030-31 (9th Cir. 2015)

7    (quoting *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir.

8    2000)).  If the moving party meets its burden of production, the burden then shifts to the

9    nonmoving party to identify specific facts from which a factfinder could reasonably find

10   in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

11   "This burden is not a light one."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th

12   Cir. 2010).  The party opposing the motion for summary judgment "must do more than

13   simply show that there is some metaphysical doubt as to the material facts."  *Scott v.*

14   *Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*

15   *Corp.*, 475 U.S. 574, 586 (1986)).  "Where the record taken as a whole could not lead a

16   rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

17   *Id.* (quoting *Matsushita*, 475 U.S. at 587).

18         A "party asserting that a fact cannot be or is genuinely disputed must support the

19   assertion by . . . citing to particular parts of materials in the record[.]"  Fed. R. Civ. P.

20   56(c)(1)(A); *see also* Local Rules W.D. Wash. LCR 10(e)(6) ("Citations to documents

21   already in the record . . . must include a citation to the docket number and the page

22   number[.]").  Further, "[a]n affidavit or declaration used to support or oppose a motion

1    must be made on personal knowledge, set out facts that would be admissible in evidence,

2    and show that the affiant or declarant is competent to testify on the matters stated." Fed.

3    R. Civ. P. 56(c)(4); *see also Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th

4    Cir. 2001) ("To be cognizable on summary judgment, evidence must be competent.").

5         The court is "required to view the facts and draw reasonable inferences in the light

6    most favorable to the [nonmoving] party." *Scott*, 550 U.S. at 378 (internal quotations

7    omitted).  It may not weigh evidence or make credibility determinations. *Anderson*, 477

8    U.S. at 249-50.  When the nonmoving party "fails to properly support an assertion of fact

9    or fails to properly address another party's assertion of fact," however, the court may

10   "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

11        <u>1.</u>      <u>TILA, HOEPA, and RESPA Claims</u>

12        Mr. Russell raises claims against WADOT for violations of TILA; the Home

13   Ownership Equity Protection Act ("HOEPA"), 15 U.S.C. § 1639; and the Real Estate

14   Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*  (3d Am. Compl.

15   ¶¶ 10.1-10.14 (RESPA), 11.1-11.30 (HOEPA and TILA).)  The WADOT Defendants

16   argue, and the court agrees, that summary judgment is warranted because Ms. Russell's

17   loans were business loans and thus exempt from these statutes.  (*See* MSJ at 12-20.)

18        Mr. Russell bears the burden of proving that Ms. Russell obtained the loans for

19   personal purposes rather than for business purposes. *Gilliam v. Levine*, 955 F.3d 1117,

20   1120 (9th Cir. 2020) ("*Gilliam I*").  Although the purpose of a loan is typically a factual

21   issue, *see Thorns v. Sundance Props.*, 726 F.2d 1417, 1419 (9th Cir. 1984), the issue may

22   be resolved as a matter of law where the facts "direct the conclusion that the loan was . . .

1    primarily for business purposes," *Gilliam v. Levine*, 562 F. Supp. 3d 614, 622 (C.D. Cal.

2    2021) ("*Gilliam II*") (quoting *Bergman v. Fid. Nat'l Fin., Inc.*, No.

3    2:12-cv-05994-ODW(MANx), 2012 WL 6013040, at *4-5 (C.D. Cal. Dec. 3, 2012)),

4    *aff'd*, No. 21-56257, 2023 WL 2770922 (9th Cir. Apr. 4, 2023) ("*Gilliam III*").

5            "For a loan to qualify as a consumer credit transaction under [TILA], a borrower

6    must demonstrate that the loan was extended to (1) a natural person, and was obtained

7    (2) 'primarily for personal, family, or household purposes.'"  *Gilliam I*, 955 F.3d at 1120

8    (quoting 15 U.S.C. § 1602(i)).  "[C]redit transactions performed for non-consumer

9    purposes, such as loans for a business purpose," are excluded from TILA.  *Id.* (citing 15

10   U.S.C. § 1603).  HOEPA is "an amendment to TILA . . . which creates 'a special class of

11   regulated loans that are made at higher interest rates or with excessive costs and fees.'"

12   *Lynch v. RKS Mortg., Inc.*, 588 F. Supp. 2d 1254, 1260 (E.D. Cal. 2008) (quoting *In re*

13   *Cmty. Bank of N. Va.*, 418 F.3d 277, 304 (3d Cir. 2005)).  Thus, TILA's definition of a

14   "consumer credit transaction" also applies to a HOEPA claim.  RESPA's exemption for

15   "credit transactions involving extensions of credit primarily for business, commercial, or

16   agricultural purposes" is "the same as the exemption . . . under [TILA]."  *Johnson v.*

17   *Wells Fargo Home Mortg., Inc.*, 635 F.3d 401, 418 (9th Cir. 2011) (quoting 12 U.S.C.

18   § 2606(b)).  Courts look to the Federal Reserve Board's ("FRB") official staff

19   interpretation of Regulation Z, the "primary administrative regulation governing Truth in

20   Lending disclosure," for guidance in determining whether a loan was obtained primarily

21   for business or personal purposes.  *Thorns*, 726 F.2d at 1419.

22

1        Mr. Russell asserts that a review of five "*Thorns* factors" demonstrates that Ms.

2   Russell's loans were primarily for personal purposes.  (*See* Resp. at 7-13 (citing *Thorns*,

3   726 F.2d at 1419); Supp. Resp. at 9-12 (same).)  In *Thorns v. Sundance Properties*, the

4   Ninth Circuit reviewed a district court's conclusion that a loan obtained for the purpose

5   of investing in a limited partnership was exempt from TILA as a matter of law.  726 F.2d

6   at 1418.  The court held that district courts should look to the official staff interpretation

7   of Regulation Z for guidance.  *Id.* at 1419.  Comment 3(a)-3(i) of the staff interpretation

8   sets forth five factors that "should be considered" when "determining whether credit to

9   finance an acquisition—such as securities, antiques, or art—is primarily for business or

10  commercial purposes (as opposed to a consumer purpose)."  *Id.* (quoting 12 C.F.R. Pt.

11  226, Supp. I, Subpt. A, § 226.3 ("Official Commentary"), cmt. 3(a)-3(i) (eff. Jan. 1,

12  2018)).[9]  These factors are:

13          [1]  The relationship of the borrower's primary occupation to the
            acquisition. The more closely related, the more likely it is to be business
14          purpose.
            [2]  The degree to which the borrower will personally manage the
15          acquisition. The more personal involvement there is, the more likely it is to
            be business purpose.
16          [3]  The ratio of income from the acquisition to the total income of the
            borrower.  The higher the ratio, the more likely it is to be business purpose.
17          [4]  The size of the transaction.  The larger the transaction, the more likely
            it is to be business purpose.
18          [5]  The borrower's statement of purpose for the loan.

19  Official Commentary, cmt. 3(a)-3(i).  The *Thorns* court did not apply the factors to the

20  loan at issue.  *Thorns*, 726 F.2d at 1419.  Instead, it reversed the district court's grant of

21  _____

22      [9] The court cites to and quotes the 2018 version of the official staff interpretation, which
    is unchanged from the version quoted in *Thorns*.

1  summary judgment to the lender and remanded for the district court to conduct a "case by

2  case analysis" of the purpose of the plaintiffs' loan.  *Id.*

3      Here, the first factor favors a personal purpose because Ms. Russell's loan

4  applications identify her as a jewelry appraiser at Value Village and Goodwill, which is

5  not closely related to real estate investment.  (*See* 1st Loan App.; 2d Loan App.)  That

6  Ms. Russell was not a real estate investor by trade does not, however, foreclose a

7  conclusion that the loan was for a business purpose.  *See Daniels v. SCME Mortg.*

8  *Bankers*, *Inc.*, 680 F. Supp. 2d 1126, 1130 (N.D. Cal. 2010) (noting that the plaintiff did

9  not explain how his employment as an electrician apprentice precluded the possibility

10  that was the loan was, "by his own contemporary admission on the loan application, for

11  'investment' purposes").

12      The second factor is neutral.  Although there is no evidence in the record that

13  anyone other than Ms. Russell managed the Greenwood Property, Mr. Russell asserts that

14  his mother would have been unable to manage a rental property in light of her age, vision

15  problems, disabilities, and limited English proficiency.  (4/29/24 Patric Russell Decl.

16  ¶ 41.)  The third factor favors a personal purpose because there is no evidence that Ms.

17  Russell derived any income from the Greenwood Property during the terms of the loans.

18      The fourth factor is also neutral.  Ms. Russell's loans were for $350,000 and

19  $443,000.  (*See* 1st Loan Agreement; 2d Loan Agreement.)  Neither party has provided

20  the court any guidance as to whether these amounts are "so disproportionately higher

21  than an average personal loan that it suggests a business purpose."  *Bergman*, 2012 WL

22  6013040, at *4 (finding $626,250 loan "fell between the parties" where neither party

introduced evidence of comparable properties or transactions); *see also Gilliam II*, 562 F. Supp. 3d 614, 623 (C.D. Cal. 2021) (finding loan for $150,000 was "relatively small" and thus favored a personal purpose).

The fifth factor strongly favors a business purpose.  Because "the fifth factor focuses on the borrower's statement of purpose, not any undisclosed purpose the borrower might have had in mind," *Gilliam III*, 2023 WL 2770922, at *2, the court must consider the information that was available to WADOT when it approved and funded Ms. Russell's loans.[10]  First, Ms. Russell's signed loan applications indicated that the Greenwood Property was an "investment" property, rather than a primary or secondary residence.  (1st Loan App.; 2d Loan App); *see Daniels*, 680 F. Supp. 2d at 1130 (finding selection of "investment" on plaintiff's loan application was a "significant deficiency" weighing against a finding of personal purpose); *Schwartz v. World Sav. Bank*, No. C11-0631JLR, 2012 WL 993295, at *1 (W.D. Wash. Mar. 23, 2012) ("By checking [the 'Investment'] box, Plaintiffs specifically acknowledged that the property was an investment property and not a 'Primary Residence' or a 'Secondary Residence.'").  Second, Ms. Russell repeatedly represented that the purpose of the loan was to make repairs on the Greenwood Property so that it could be rented out.  (*See, e.g.*, 1st Loan Summary; 4/11/24 McIntosh Decl. ¶ 8, Ex. G at 62-63.)  Third, the insurance policies

---

[10] Mr. Russell asserts that Capital Compete acted as WADOT's agent and thus "Ms. Russell's statements to Capital Compete are imputed to WADOT."  (*See* Resp. at 20-23; Supp. Resp. at 12.)  The WADOT Defendants disagree.  (*See* MSJ at 11-12; Reply at 5.)  For the purpose of this motion, the court assumes, but does not decide, that WADOT had knowledge of statements Ms. Russell made to Capital Compete.

1   reviewed by WADOT in connection with closing the loans were rental dwelling policies.

2   (*See* 1st Ins. Proof; 2d Ins. Proof.)  Finally, Ms. Russell repeatedly represented in her

3   signed loan documents that the loans were to be used for a business purpose and

4   expressly not for a personal purpose.  (*See, e.g.*, 1st Cond'l App.; 1st Business Letter; 1st

5   Loan Agreement; 1st Note; 1st DOT; 2d Loan Agreement; 2d Note; 2d DOT.)  WADOT

6   relied on Ms. Russell's representations that the purpose of the loan was commercial in

7   nature to approve the loans.  (3/23/23 Eggers Decl. ¶ 11.)

8          In sum, "'[e]xamin[ing] the transaction as a whole,' paying particular attention to

9   'the purpose for which the credit was extended,'" the court concludes, based on the

10  undisputed facts, that Ms. Russell's loans were primarily for a business purpose.  *Gilliam*

11  *III*, 2023 WL 2770922, at *1 (quoting *Slenk v. Transworld Sys., Inc.*, 236 F.3d 1072,

12  1075 (9th Cir. 2001) (cleaned up)); *see also Gilliam II*, 562 F. Supp. 3d at 625 ("[A]

13  court need not find that all factors point in one direction to grant summary judgment as to

14  the primary purpose of a loan." (citing *Bergman*, 2012 WL 6013040, at *4-5)).

15         Mr. Russell's opposing arguments are not persuasive.  First, he argues that Ms.

16  Russell "repeatedly and unequivocally represented to WADOT that she was applying for

17  a ***residential*** loan by submitting a Uniform ***Residential*** Loan Application."  (Resp. at 8

18  (cleaned up).)  The Uniform Residential Loan Application, however, asks for the purpose

19  of the loan and whether the property at issue is a principal residence, a secondary

20  residence, or an investment.  *See Gilliam II*, 562 F. Supp. 3d at 619 (noting that, while

21  not dispositive, listing a property as an "investment" property on plaintiff's Uniform

22  Residential Loan suggested a business purpose); *see also Revocable Living Tr. of Strand*

*v. Wel-Co Grp.*, 86 P.3d 818, 822 (Wash. Ct. App. 2004) (rejecting debtor's "essential" but unsupported assumption "that, by definition, no loan for the purchase of residential property can be for a business or investment purpose"). Thus, the fact that the parties used a form titled "Universal Residential Loan Application" is not probative evidence that Ms. Russell's loans were obtained primarily for a personal purpose.

Second, Mr. Russell asserts that the Greenwood Property never was and never could be a rental property. (*See, e.g.*, Resp. at 8, 18-19; *see also* 4/29/24 Patric Russell Decl. ¶ 13 (stating that the Greenwood Property "has never, ever been a rental property, nor was it ever intended to be" one). That Ms. Russell did not in fact rent out the Greenwood Property after obtaining the loans, however, is of no moment because what matters is what she represented to WADOT when she applied for the loans. *See Gilliam III*, 2023 WL 2770922, at *2 (rejecting borrower's argument that the fifth factor favored a personal purpose because she "never actually purchased a new rental property" where borrower "point[ed] to no evidence that she conveyed this purpose to [the lender] before the loan was made").

Third, Mr. Russell argues that Ms. Russell's his statement in her November 20, 2018 email to Capital Compete that she was "not comfortable to take this loan as a business loan" "shows that Ms. Russell was requesting that the loan not be a business loan, which she was not comfortable with[,] and which supports an inference <u>against WADOT</u> that Ms. Russell was not comfortable with it because she had no business purpose." (Resp. at 10-11; 4/11/24 McIntosh Decl. ¶ 4, Ex. C at 24.) Even if the statement were admissible, the context of the November 2018 emails makes clear that it

1    refers to the Velocity loan rather than the second WADOT loan.  (*See* 4/11/24 McIntosh

2    Decl., Ex. C at 23-29.)  It was not until later in November 2018 that Ms. Russell decided

3    to return to WADOT for her second loan.  (*See id.* at 29-30.)

4            Finally, Mr. Russell contends that the loans must be for a personal purpose

5    pursuant to comment 3(a)-4 of the official staff interpretation.  (Resp. at 14 (quoting

6    Official Commentary, cmt. 3(a)-4); Supp. Resp. at 9 (same).)  That comment states:

> Non-owner-occupied rental property.  Credit extended to acquire, improve,
> or maintain rental property (regardless of the number of housing units) that
> is not owner-occupied is deemed to be for business purposes. . . .  If the
> owner expects to occupy the property for more than 14 days during the
> coming year, the property cannot be considered non-owner-occupied and this
> special rule will not apply.  For example, a beach house that the owner will
> occupy for a month in the coming summer and rent out the rest of the year is
> owner occupied and is not governed by this special rule.  (See comment
> 3(a)-5, however, for rules relating to owner-occupied rental property.)

12   Official Commentary, cmt. 3(a)-4.  Mr. Russell asserts that he defeats summary judgment

13   because "Defendants submit <u>zero</u> evidence" that "Ms. Russell did not even 'expect' to

14   occupy the Greenwood Home for more than 14 days during the coming year."  (Supp.

15   Resp. at 9.)  But it is Mr. Russell, not Defendants, who bears the burden to establish that

16   the loans were for a personal purpose.  *Gilliam I*, 955 F.3d at 1120.

17           Although Mr. Russell asserts that he and Ms. Russell in fact occupied the

18   Greenwood Property for more than 14 days in 2018 and 2019 and that his mother

19   "always expected and intended" to do so (*see* 4/29/24 Patric Russell Decl. ¶¶ 36, 39), he

20   does not direct the court to any admissible evidence that Ms. Russell ever represented to

21   *WADOT or Capital Compete* that she intended to occupy the Greenwood Property for

22   more than 14 days in the coming year when she applied for the loans and entered into the

loan agreements (*see generally id.*; Resp.; Supp. Resp.).  Mr. Russell's averments in his

declaration that he lived at the Greenwood Property and personally intended to spend

more than 14 days per year there do not help his case.  (*See* 4/29/24 Patric Russell Decl.

¶¶ 36, 39.)  Mr. Russell had no ownership interest in the Greenwood Property,[11] and his

personal intent does not establish that *Ms. Russell* intended to occupy the Greenwood

Property for more than 14 days in the year after she obtained the loans, as required to

show that the Greenwood Property was "owner-occupied" within the meaning of

Regulation Z.  To the contrary, as discussed above, Ms. Russell consistently represented

to WADOT and Capital Compete that she resided at the Ballard Property; there is no

evidence she said anything about her personal occupation of the Greenwood Property to

either entity.  Thus, Mr. Russell has not met his burden to demonstrate a genuine issue of

material fact that the Greenwood Property was owner-occupied within the meaning of

Regulation Z.  *See Johnson*, 635 F.3d at 417 (holding that where mortgages were for

"non-owner-occupied rental properties," the mortgages were business-purpose loans).

Even if Mr. Russell had made such a showing, the court would still reach the same

result.  Contrary to Mr. Russell's assertions, Comment 3(a)-4 does not state that credit

extended to maintain owner-occupied rental property is, by definition, for a personal

purpose.  *See* Official Staff Interpretation, cmt. 3(a)-4.  Instead, the comment directs the

---

[11] Although Ms. Russell attempted to transfer title in the Greenwood Property to Mr. Russell in 2012, the King County Superior Court ruled that the transfer was invalid.  (*See* 2/7/22 McIntosh Decl. ¶ 2, Ex. A (court order finding that Ms. Russell's attempt to transfer the Greenwood Property to Mr. Russell was fraudulent).)

1  reader to comment 3(a)-5 "for rules relating to owner-occupied rental property."

2  Comment 3(a)-5 provides, in relevant part:

> 5. Owner-occupied rental property.  If credit is extended to acquire, improve,
> or maintain rental property that is or will be owner-occupied within the
> coming year, different rules apply:
> . . . .
> ii. Credit extended to improve or maintain the rental property is deemed to
> be for business purposes if it contains more than 4 housing units.  Since the
> amended statute defines dwelling to include 1 to 4 housing units, this rule
> preserves the right of rescission for credit extended for purposes other than
> acquisition.  *Neither of these rules means that an extension of credit for
> property containing fewer than the requisite number of units is necessarily
> consumer credit.  In such cases, the determination of whether it is business
> or consumer credit should be made by considering the factors listed in
> comment 3(a)–3.*

Official Commentary, cmt. 3(a)-5 (emphasis added).  Thus, because only one unit is at

issue, the court should consider the factors listed in comment 3(a)-3 to determine whether

the loans were for a business or consumer purpose.  That comment, of course, sets forth

the five factors the court considered above in determining that there is no genuine dispute

that Ms. Russell's loans were primarily for business purposes.  *See* Official Commentary,

cmt. 3(a)-3; *Gilliam II*, 562 F. Supp. 3d at 622.

Because Mr. Russell has failed to meet his burden to demonstrate a genuine

dispute of material of fact regarding the purpose of Ms. Russell's loans, his claims under

TILA, HOEPA, and RESPA, all of which apply only to consumer credit transactions, are

foreclosed.  The court grants the WADOT Defendants' motion for summary judgment on

Mr. Russell's TILA, HOEPA, and RESPA claims.[12]

---

[12] The court also grants summary judgment on Mr. Russell's claims under the
Washington Consumer Protection Act, ch. 19.86 RCW ("WCPA"), to the extent those claims are

1          2.      ECOA Claim

2          The ECOA "applies to all credit transactions between creditors and applicants and

3    precludes creditors from (1) discriminating against applicants based on their membership

4    in a protected class, or (2) failing to notify applicants of an adverse action in accordance

5    with the statutory requirements of the ECOA." *Nia v. Bank of Am., N.A.*, 603 F. Supp. 3d

6    894, 900 (S.D. Cal. 2022).  It also requires creditors to "'furnish to an applicant a copy of

7    any . . . written appraisals' developed in connection with an application for credit

8    'promptly upon completion, but in no case later than 3 days prior to the closing of the

9    loan.'"  *El-Shawary v. US Bank Nat'l Ass'n*, No. C18-1456JCC, 2021 WL 5177574, at *8

10   (W.D. Wash. Nov. 8, 2021) (quoting 15 U.S.C. § 1691(e)(1)).

11         Mr. Russell alleges that WADOT violated the ECOA by failing to provide Ms.

12   Russell "all required and necessary disclosures . . . including any credit decisions or the

13   basis therefor regarding the subject loans" and by discriminating against her on the basis

14   of her race, national origin, and age.  (3d Am. Compl. ¶¶ 13.1-13.10.)  The WADOT

15   Defendants argue that the claim fails as a matter of law because (1) WADOT never took

16   any "adverse action" against Ms. Russell as defined by the statute and (2) there is no

17   evidence supporting the assertion that WADOT discriminated against Ms. Russell.  (MSJ

18   at 13, 20-21.)  Mr. Russell does not respond directly to these arguments.  (Resp. at 24.)

19   Instead, he asserts that he need not prove that WADOT denied Ms. Russell credit due to

20   unlawful discrimination because the ECOA also requires creditors to provide applicants

21   ─────────────────────

22   based on violations of TILA, HOEPA, and RESPA.  (*See* 3d Am. Compl. ¶¶ 14.5-14.6 (alleging
     WCPA claims based on violations of "federal lending statutes").)

1   with copies of appraisals or other written valuations that were developed in connection

2   with a credit application.  (*Id.*)  In his supplemental response, Mr. Russell appears to

3   abandon any argument that the WADOT Defendants discriminated against his mother

4   and instead focused on the asserted failure to provide copies of appraisals.  (*See* Supp.

5   Resp. at 15-17.)

6          First, Mr. Russell's purported ECOA appraisal claim fails because he has not

7   brought such a claim.  He makes no allegations that WADOT (or Capital Compete) ever

8   produced an appraisal or valuation of the Greenwood Property[13] and failed to timely

9   provide it to Ms. Russell; indeed, the words "appraisal" and "valuation" do not appear

10  anywhere in the third amended complaint.  (*See generally* 3d Am. Compl.)  Mr. Russell

11  may not attempt to add a new claim now through his response to the motion for summary

12  judgment.  *See Riser v. Cent. Portfolio Control Inc.*, No. C21-5238LK, 2022 WL

13  2209648, at *4 n.1 (W.D. Wash. June 21, 2022) (so holding with respect to a motion to

14  dismiss).  Even if Mr. Russell had alleged an ECOA appraisal claim, he has not directed

15  the court to any evidence that an appraisal or valuation was developed in connection with

16  Ms. Russell's loan applications.  (*See generally* Resp.; Supp. Resp.)  Accordingly, the

17  court grants summary judgment in the WADOT Defendants' favor on Mr. Russell's

18  purported ECOA appraisal claim.

19

20          _____

21          [13] "[T]here is no statutory requirement that a creditor or mortgage lender develop an appraisal in the first place when considering a loan application," *Edwards v. Tenn. Valley Fed. Credit Union*, No. 1:23-cv-233, 2024 WL 2981180, at *5 (E.D. Tenn. June 13, 2024), and "the regulations implementing ECOA do not require a lender to develop an appraisal but rather explain the proper disclosure process in greater detail," *id.* (citing 12 C.F.R. § 1002.14).

22

1       Second, the court agrees with the WADOT Defendants that Mr. Russell has not

2  met his burden to demonstrate a genuine dispute of fact as to his ECOA discrimination

3  and notice claims.  To prevail on an ECOA discrimination claim a plaintiff must show

4  that she (1) is a member of a protected class; (2) applied for credit from the defendant;

5  and (3) was denied credit based on her protected status.  *Egbukichi v. Wells Fargo Bank,*

6  *NA*, 184 F. Supp. 3d 971, 980 (D. Or. 2016).  To prevail on an ECOA notice claim, the

7  plaintiff must show that the creditor took an adverse action against her and did not

8  provide a statement of reasons for taking the adverse action.  *See Schlegel v. Wells Fargo*

9  *Bank, NA*, 720 F.3d 1204, 1210 (9th Cir. 2013) (citing 15 U.S.C. § 1691(d)(2)).  The

10  ECOA defines "adverse action as "a denial or revocation of credit, a change in the terms

11  of an existing credit arrangement, or a refusal to grant credit in substantially the amount

12  or on substantially the terms requested."  15 U.S.C. § 1691(d)(6).  Here, there is no

13  dispute that WADOT approved Ms. Russell's applications and extended her the credit

14  she sought.  Thus, because Mr. Russell cannot prove that Ms. Russell suffered an

15  "adverse action" under the ECOA, the court grants the WADOT Defendants' motion for

16  summary judgment on Mr. Russell's ECOA discrimination and notice claims.[14]

17      3.    Washington Statutory Claims

18       Mr. Russell's response to the WADOT Defendants' motion for summary

19  judgment on his Washington statutory claims (*see* MSJ at 21-25) is brief:

20

21         [14] The court also grants summary judgment on Mr. Russell's WCPA claims to the extent those claims are based on violations of the ECOA.  (*See* 3d Am. Compl. ¶¶ 14.5-14.6 (alleging

22  WCPA claims based on violations of "federal lending statutes").)

1

2

      Plaintiff incorporates by reference Ms. Russell's prior response to
WADOT's argument with regard to these claims.  For the reasons discussed
above and therein, WADOT's MSJ fails.

3  (Resp. at 24 (citing 1st MSJ Resp. (Dkt. # 43) at 21-15).)  Mr. Russell also purports to

4  "adopt[] and incorporate[]" Mr. Lowell's expert report.  (*Id.* at 24 n.138 (citing Lowell

5  Report, without citing any specific pages in the report).)  In its May 7, 2024 order, the

6  court warned Mr. Russell that it would not consider arguments that he purported to adopt

7  and incorporate wholesale from Ms. Russell's prior filings and gave Mr. Russell a second

8  chance to respond to the WADOT Defendants' motion.  (*See* 5/7/24 Order at 3 n.1.)

9  Therefore, the court does not consider arguments made solely in Ms. Russell's response

10  to the WADOT Defendants' first motion for summary judgment.  *See Carmen*, 237 F.3d

11  1026, 1020-31 (9th Cir. 2001) (holding the district court does not have an independent

12  duty to "search and sift" the record for the benefit of the nonmoving party); *Richards v.*

13  *City of Seattle*, No. C07-1022TSZ, 2008 WL 2570668, at *1 (W.D. Wash. June 26,

14  2008), *aff'd*, 342 F. App'x 289 (9th Cir. 2009) (noting that plaintiff's filings "lack[ed] the

15  specificity needed to survive a motion for summary judgment"); *id.* at *1 n.2 ("If an

16  attorney representing a party resisting summary judgment has not sufficiently cited in the

17  response brief the critical evidence demonstrating a need for trial, the attorney cannot

18  otherwise accomplish the task by merely heaping reams of paper upon the Court.").  The

19  court also does not consider the legal opinions in Mr. Lowell's expert report for the

20  reasons stated above.  To the extent Mr. Russell makes substantive arguments in his

21  supplemental response, however, the court considers those arguments below.

22

1

        *a.     Usury Claim*

2       The court starts with Mr. Russell's usury claim.  Mr. Russell alleges that WADOT

3  violated Washington's usury statute, ch. RCW 19.52, by making "a residential mortgage

4  loan that was purportedly secured by the DOT recorded on title to [Ms. Russell's]

5  Greenwood Home, which loan charged loan fees and interest in violation of" that statute.

6  (3d Am. Compl. ¶¶ 9.1-9.3.)  The WADOT Defendants do not argue that the interest

7  rates on Ms. Russell's loans were non-usurious; instead, they ask the court to grant their

8  motion because the usury statute does not apply to loans that were made primarily for a

9  business or commercial purpose.  (MSJ at 23; *see also* Reply at 7; Supp. Reply at 10.)

10  Mr. Russell responds that his claim survives because the WADOT Defendants have not

11  shown that the loans were "*exclusively* for commercial or business purpose."  (Supp.

12  Resp. at 18 (citing *Aetna Fin. Co. v. Darwin*, 691 P.2d 581, 585 (Wash. Ct. App. 1984)).)

13       To prevail on his usury claim, Mr. Russell must establish (1) a loan, (2) an

14  understanding that the principal must be repaid, (3) the exaction of an unlawful interest

15  rate, and (4) intent to violate the law.  *Jansen v. Nu-W., Inc.*, 6 P.3d 98, 102 (Wash. Ct.

16  App. 2000), *as amended on reconsideration* (Sept. 21, 2000) (citing *Liebergesell v.*

17  *Evans*, 613 P.2d 1170, 1174 (Wash. 1980)).  An action for usury cannot be maintained,

18  however, if the loan was primarily for commercial, investment, or business purposes.  *Id.*

19  (citing RCW 19.52.080).[15]  Where, as here, the loan is usurious on its face, the burden is

20

21

22

     [15] The usury statute was amended in 1981 to eliminate the requirement that the loan be "exclusively" for business purposes for the exemption to apply.  *See Brown v. Giger*, 757 P.2d 523, 526 (Wash. 1988).

1    on the lender to show the business exception applies.  *Id.* (citing *Marashi v. Lannen*, 780

2    P.2d 1341, 1343 (Wash. Ct. App. 1989)).

3            As with TILA, a loan's purpose is "principally established by the representations

4    the borrower makes to the lender at the time the loan is procured."  *Brown*, 757 P.2d at

5    527; *see also Jansen*, 6 P.3d at 103 ("We characterize the loan based on the borrower's

6    manifestations of intent at the time the parties entered into the loan contract.").  Thus,

7    "[a]n uncontradicted contemporaneous written loan agreement containing an unequivocal

8    statement of purpose is conclusive evidence and satisfies the lender's initial burden."

9    *Strand*, 86 P.3d at 821 (citing *Brown*, 757 P.2d at 527).  "A question of fact arises,"

10   however, "if the borrower's oral representations contradict the written representations."

11   *Jansen*, 6 P.3d at 102.  "[W]hile the factual circumstances of making a loan are within the

12   province of the jury, the ultimate determination of the primary purpose of the loan is a

13   question of law."  *Id.* at 100.

14           The Washington Supreme Court's opinion in *Brown v. Giger* is instructive.  In that

15   case, the Court affirmed the trial court's determination on summary judgment that a loan

16   was primarily for a commercial or business purpose.  757 P.2d at 527.  Noting that the

17   borrower "never made clear" to the lender that she would have no interest in the business

18   venture of a friend who accompanied her to her loan interview, the court found "more

19   conclusive" the loan documents, which were signed by the borrower and described the

20   loan as having a business or commercial purpose.  *Id*.  It rejected the Court of Appeals's

21   emphasis on the borrower's subjective purpose for taking out the loan.  *See id.* at 526-27.

22

1    Like the borrower in *Brown*, Ms. Russell represented repeatedly in her loan

2    documents and elsewhere that she obtained the loans for a business or commercial

3    purpose and expressly not for a personal purpose.  Thus, the burden shifts to Mr. Russell

4    to contradict these writings with evidence of oral representations made at the time of the

5    transactions that would permit a reasonable jury to find that WADOT knew the loans

6    were for a consumer purpose.  *See Strand*, 86 P.3d at 821 (applying a burden-shifting

7    framework).  Mr. Russell, however, cites no competent, non-hearsay evidence of any

8    representations Ms. Russell made to WADOT or Capital Compete that contradict her

9    signed writings.  (*See generally* Resp.; Supp. Resp.)  Therefore, the court concludes as a

10   matter of law that Ms. Russell's loans were for a business purpose and, as a result, the

11   WADOT Defendants are entitled to summary judgment on Mr. Russell's usury claim.

12   Mr. Russell argues that *Davis v. Blackstone Corp.*, No. 71090-7-I, 2015 WL

13   890992 (Wash. Ct. App. Mar. 2, 2015) (unpublished) supports his position that the loans

14   were for a personal purpose.  (Resp. at 20.)  There, the Court of Appeals reversed the trial

15   court's determination on summary judgment that a loan was for a business purpose.

16   *Davis*, 2015 WL 890992, at *1.  The court identified a genuine issue of material fact

17   regarding the loan's purpose where the borrower "consistently maintained that the

18   purpose of the loan was personal," other witnesses corroborated the purpose of her loan,

19   and her loan broker wrote a note stating the borrower "[n]eeds money to live, build up

20   reserves, and to rehab Seattle prop for business/rental cash flow."  *Id.* at *1, *9.  Here, by

21   contrast, Ms. Russell's signed loan documents consistently state that the loans were for a

22   business or commercial purpose and expressly not for a personal purpose.  Mr. Russell

1    has not produced any evidence that she told WADOT that her loan proceeds would be

2    "spent primarily on personal expenditures." *See Jansen*, 6 P.3d at 103.  The court grants

3    the WADOT Defendants' motion for summary judgment on the usury claim.[16]

4                    b.    *Deed of Trust Act Claims*

5          The WADOT Defendants raise two arguments in favor of summary judgment on

6    Mr. Russell's claims under under Washington's Deed of Trust Act ("DTA"), ch. 61.24

7    RCW.  First, assert that summary judgment on Mr. Russell's direct claim for damages is

8    warranted because the Greenwood Property has not been subject to a nonjudicial

9    foreclosure sale.  (MSJ at 21.)  Mr. Russell concedes that he does not have a stand-alone

10   cause of action under the DTA.  (Supp. Resp. at 17); *see Frias v. Asset Foreclosure*

11   *Servs., Inc.*, 334 P.3d 529, 534 (Wash. 2014) (holding that a plaintiff has no cause of

12   action under the DTA absent a completed foreclosure sale).  Accordingly, the court

13   grants the WADOT Defendants' motion for summary judgment to the extent Mr. Russell

14   asserts a stand-alone DTA claim for damages.

15         Second, the WADOT Defendants ask the court to grant them summary judgment

16   on Mr. Russell's WCPA claim based on alleged violations of the DTA because RCW

17   61.24.031, which sets forth requirements related to notices of default, does not apply to

18   commercial loans.  (MSJ at 20-21 (citing RCW 61.24.031(7)(a)).)  Mr. Russell does not

19   dispute that RCW 61.24.031 does not apply to commercial loans.  (*See* Supp. Resp. at

20

21

22         [16] The court also grants summary judgment on Mr. Russell's WCPA claim based on
     violations of the usury statute.  (*See* 3d Am. Compl. ¶ 14.14.)

17.)  He argues, however, that WADOT's violations of the DTA are not limited to failure

to comply with that statute.  (*Id.*)  He asserts that:

> although WADOT tries to minimize the outcome of the first trustee's sale
> by stating it was simply "discontinued," WADOT, in fact, had violated the
> DTA and had to cancel the sale:  Lacking authority to do so, it wrongfully
> appointed NCW as Successor Trustee, which resulted in the cancellation of
> the first sale.

(*Id.* (citing 3d Am. Compl. ¶¶ 5.55-5.68).)  Mr. Russell does not, however, identify which

provisions of the DTA WADOT's conduct allegedly violated, nor does he direct the court

to competent evidence that supports his claim.  (*See generally id.*)  Therefore, the court

grants the WADOT Defendants' motion for summary judgment on Mr. Russell's WCPA

claim based on alleged violations of the DTA.

        c.     *Washington Consumer Loan Act Claims*

Mr. Russell alleges that WADOT violated the Washington Consumer Loan Act

("WCLA"), ch. 31.04 RCW, by making a residential mortgage loan without a proper

license and by failing to make required disclosures.  (3d Am. Compl. ¶¶ 8.1-8.6.)

Because the WCLA does not provide a private right of action, Mr. Russell's claim for

violations of the WCLA is cognizable only under the WCPA.  *Saepoff v. HSBC Bank

USA, N.A.*, No. 20-36031, 2022 WL 1500799, at *1 (9th Cir. May 12, 2022); *see also Est.

of Brantner v. Ocwen Loan Servicing, LLC*, No. C17-0582TSZ, 2021 WL 3053055, at *3

(W.D. Wash. July 20, 2021).

Under the WCLA, a lender must generally obtain a license or a license waiver

before making a loan.  RCW 31.04.025.  The WCLA does not apply, however, to "a loan

primarily for business, commercial, or agricultural purposes *unless the loan is secured by*

1   *a lien on the borrower's primary dwelling*."  RCW 31.04.025(4)(e) (emphasis added); *see*

2   *also* Wash. Admin. Code 208-620-104(3).

3          The WADOT Defendants assert that they are entitled to summary judgment

4   because Ms. Russell's loans were for a business or commercial purpose and the

5   Greenwood Property was not Ms. Russell's primary dwelling.  (MSJ at 16-18, 22; Reply

6   at 7; Supp. Reply at 10.)  Mr. Russell does not directly address the WCLA claim in his

7   response and supplemental response.  (*See* Resp. at 24; Supp. Resp. at 17-18 ("For the

8   reasons discussed in Plaintiff's opposition to the MSJ and this supplemental briefing, this

9   claim should survive the MSJ.").)  He does, however, argue that the Greenwood Property

10  was Ms. Russell's primary residence elsewhere in his briefing.  Therefore, the court

11  considers below whether the WADOT Defendants have met their burden to show, as a

12  matter of law, that the Greenwood Property was not Ms. Russell's primary dwelling.

13         The WADOT Defendants point to documents and testimony, made under oath or

14  under penalty of perjury, in which Ms. Russell represented that the Ballard Property was

15  her primary residence, including (1) her loan applications, which state that the

16  Greenwood Property was an investment property and not her primary residence; (2) her

17  bankruptcy filings, in which she claimed the Ballard Property as her exempt homestead

18  and described the Greenwood Property as vacant; and (3) her testimony in the August

19  2017 Section 341 hearing that the Greenwood Property was vacant.  WADOT also directs

20  the court to a senior citizen property tax exemption that Ms. Russell received for the

21  Ballard Property between 2014 and 2022.  (3/23/23 McIntosh Decl. ¶¶ 8-11, Exs. H

22  (showing Ms. Russell as taxpayer for the Ballard Property), I (King County Department

1    of Assessments Property Detail Report for the Ballard Property), J (explaining that "FS"

2    in the Property Detail Report means "Senior Citizen Exemption").)  For the senior citizen

3    property tax exemption to apply, the property taxes "must have been imposed upon a

4    residence which was occupied by the person claiming the exemption as a principal place

5    of residence at the time of filing."  RCW 84.36.381(1)(a).  The claimant must attest under

6    oath that they qualify for the exemption.  RCW 84.36.387(1).

7         Mr. Russell relies on the following evidence to counter the WADOT Defendants'

8    assertion that the Ballard Property was Ms. Russell's primary dwelling:  (1) Ms. Russell's

9    driver's license, which displays the Greenwood Property address (2d. Am. Compl. (Dkt.

10   # 31), Ex. 3 at 67); (2) a letter from Ms. Russell's physician stating under penalty of

11   perjury that the Greenwood Property has been Ms. Russell's "primary residence since at

12   least 2015" (4/21/23 Petra Russell Decl. ¶ 13, Ex. 1); (3) Ms. Russell's November 2017

13   credit report, which listed addresses for both the Greenwood Property and the Ballard

14   Property (3/23/23 Egger Decl., Ex. D at 23); (4) evidence that Ms. Russell never rented

15   out the Greenwood Property (*see, e.g.*, 4/29/24 Patric Russell Decl. ¶¶ 13, 41); (5) Mr.

16   Russell's statements in his declaration that the Greenwood Property was his and his

17   mother's primary residence during the relevant time period (*see, e.g.*, *id.* ¶¶ 3, 12, 21);

18   (6) Mr. Russell's statement that his mother applied for the property tax exemption for the

19   Ballard Property because the taxes for the Greenwood Property were in his name (*id.*

20   ¶ 14); and (7) Mr. Russell's bankruptcy petition, which lists his residence as the

21   Greenwood Property (*id.* ¶¶ 16-17, Ex. 1).  (*See generally* Resp.; Supp. Resp.)

22

1    The court concludes that Mr. Russell has not met his burden to produce evidence

2    from which a reasonable factfinder could conclude that the Greenwood Property was Ms.

3    Russell's primary dwelling when she applied for her loans in 2017 and 2018.  First, much

4    of his cited evidence is neither relevant nor probative.  For example, although the

5    Greenwood Property address appears in the credit report, the report lists the Ballard

6    Property as Ms. Russell's "current address."  (*See* 3/23/23 Egger Decl., Ex. D at 19.)  The

7    fact that Mr. Russell listed the Greenwood Property as his residence in his withdrawn

8    bankruptcy petition says nothing about Ms. Russell's primary dwelling, particularly

9    where her own petition identified the Ballard Property as her residence and exempt

10   homestead.  That Ms. Russell did not rent out the Greenwood Property does not support

11   the inference that the Greenwood Property was her primary dwelling.  And Ms. Russell's

12   physician states no basis for personal knowledge that the Greenwood Property was Ms.

13   Russell's primary residence.  *See* Fed. R. Civ. P. 56(c)(4).  Second, Mr. Russell's

14   statements in his declaration regarding Ms. Russell's primary residence and her reason

15   for applying for the property tax exemption for the Ballard Property are self-serving and

16   flatly contradict statements Ms. Russell made under oath and/or under the penalty of

17   perjury.  Thus, those statements do not present "a sufficient disagreement to require

18   submission to a jury."  *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)

19   (citing *Anderson*, 477 U.S. at 251-52).

20       In sum, viewing the cited evidence in the light most favorable to Mr. Russell, the

21   court cannot conclude that a reasonable jury could find that the Greenwood Property,

22   which secured the loans, was Ms. Russell's primary residence.  Therefore, the court

1  grants the WADOT Defendants' motion for summary judgment on Mr. Russell's WCPA

2  claim based on violations of the WCLA.[17]

3          d.      Other WCPA Claims

4          The WCPA prohibits "[u]nfair methods of competition and unfair or deceptive

5  acts or practices in the conduct of any trade or commerce."  RCW 19.86.020.  To succeed

6  on a WCPA claim, the plaintiff "must establish (1) an unfair or deceptive act (2) in trade

7  or commerce (3) that affects the public interest, (4) injury to the plaintiff in his or her

8  business or property, and (5) a causal link between the unfair or deceptive act complained

9  of and the injury suffered." *Trujillo v. Nw. Tr. Servs., Inc.*, 355 P.3d 1100, 1107 (Wash.

10  2015).  The plaintiff can establish the first two elements by showing the alleged act

11  amounts to a per se unfair or deceptive trade practice.  *Hangman Ridge Training Stables,*

12  *Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 535 (Wash. 1986).  A per se unfair or

13  deceptive trade practice exists when a defendant violates a statute that the legislature has

14  declared to constitute an unfair or deceptive act in trade or commerce.  *Id.*

15          The WADOT Defendants argue that Mr. Russell cannot show an unfair or

16  deceptive act or practice, public interest impact, or a causal link between any unfair or

17  deceptive acts and an injury.  (MSJ at 23-25.)  Mr. Russell makes no substantive

18  argument in support of his WCPA claim in his response.  (*See* Resp. at 24.)  In his

19

20          [17] Because the court concludes that there is no genuine dispute of material fact regarding
Ms. Russell's primary dwelling, the court need not consider whether Mr. Russell is judicially

21  estopped from arguing that the Greenwood Property was Ms. Russell's primary dwelling based
on representations she made during her bankruptcy proceedings and in her applications for the

22  senior property tax exemption.  (*See* MSJ at 17-20.)

1    supplemental response, he relies solely on the WADOT Defendants' alleged statutory

2    violations to establish an unfair or deceptive act or practice in trade or commerce, does

3    not mention public interest impact, and focuses most of his argument on damages.  (*See*

4    Supp. Resp. at 18-19 (referring to violations of the DTA, RESPA, the CLA, TILA, and

5    the usury act).)

6            The court concludes that Mr. Russell has not met his burden to demonstrate a

7    genuine dispute of material fact as to the elements of his WCPA claim.  First, Mr. Russell

8    cannot rely on a per se unfair or deceptive trade practice to satisfy the first two elements

9    of his WCPA claim because he has failed, as a matter of law, to establish claims against

10   the WADOT Defendants based on violations of TILA, HOEPA, RESPA, the ECOA, the

11   usury statute, the DTA, and the WCLA.[18]  Second, Mr. Russell has presented no evidence

12   of a "likelihood that additional plaintiffs have been or will be injured in exactly the same

13   fashion" or of a "real and substantial potential for repetition" of the WADOT

14   Defendants' conduct as required to satisfy the public interest element.  *See Michael v.*

15   *Mosquera-Lacy*, 200 P.3d 695, 700 (Wash. 2009) (first quoting *Hangman Ridge*, 719

16   P.2d at 538; and then quoting *Eastlake Constr. Co. v. Hess*, 686 P.2d 465, 477 (Wash.

17   1984)); (*see generally* Resp.; Supp. Resp.).  Accordingly, the court grants the WADOT

18   Defendants' motion for summary judgment on Mr. Russell's WCPA claim.

19

20   _____

      [18] It is unclear whether Mr. Russell intended to bring WCPA claims against the WADOT
21   Defendants based on the Mortgage Broker Practices Act, ch. 19.146 RCW, the Title Insurers
      Act, ch. 48.29 RCW, and the Abuse of Vulnerable Adults Act, ch. 74.34 RCW.  (*See* 3d Am.
22   Compl. ¶¶ 14.7-14.10, 14.12.)  In any event, his WCPA claims based on those statutes fail
      because the statutes do not apply to the WADOT Defendants.

1

       <u>4.</u>     <u>Washington Common Law Claims</u>

2

      The WADOT Defendants move for summary judgment on Mr. Russell's

3

Washington common law claims for breach of contract, unjust enrichment, and an

4

accounting.  (MSJ at 25-26.)  Again, Mr. Russell's response is just two sentences long:

5

      Plaintiff incorporates by reference Ms. Russell's prior response to
      WADOT's argument with regard to these claims.  For the reasons discussed

6

      above and therein, WADOT's MSJ fails.

7

(Resp. at 25 (citing 1st MSJ Resp. at 21-15).)  Mr. Russell also again purports to "adopt[]

8

and incorporate[] Mr. Lowell's expert report."  (*Id.* at 25 n.139 (citing Lowell Report,

9

without citing specific pages in the report).)  For the reasons set forth above, the court

10

does not consider arguments made solely in Ms. Russell's response to the WADOT

11

Defendants' first motion for summary judgment, nor does it consider legal conclusions

12

set forth in Mr. Lowell's expert report in evaluating Mr. Russell's common law claims.

13

         *a.*     *Breach of Contract and Implied Covenant of Good Faith and Fair*
               *Dealing*

14

15

      Mr. Russell brings a claim for "breach of contract and of the implied covenant of

good faith and fair dealing" against WADOT and Capital Compete.  (3d Am. Compl.

16

¶¶ 6.1-6.11 (capitalization altered).)  The elements of a breach of contract claim are:

17

(1) the existence of a valid contract between the parties, (2) defendant's breach, and

18

(3) damages.  *See Lehrer v. Wash. Dep't of Soc. & Health Servs.*, 5 P.3d 722, 727 (Wash.

19

Ct. App. 2000).  "Federal courts regularly dismiss unadorned breach of contract claims

20

where the claimant fails to cite the contractual provision that was allegedly breached."

21

*Block Mining, Inc. v. Hosting Source, LLC*, No. C24-0319JLR, 2024 WL 3012948, at

22

1    *10 (W.D. Wash. June 14, 2024) (compiling cases).  The implied duty of good faith and

2    fair dealing, meanwhile, "obligates the parties to cooperate with each other so that each

3    may obtain the full benefit of performance."  *Badgett v. Sec. State Bank*, 807 P.2d 356,

4    360 (Wash. 1991).  The duty "requires only that the parties perform in good faith the

5    obligations imposed by their agreement" and thus "arises only in connection with terms

6    agreed to by the parties."  *Id.*

7         The WADOT Defendants correctly assert that Mr. Russell has not identified which

8    contract terms WADOT allegedly breached or failed to perform in good faith.  (MSJ at

9    25.)  As noted above, Mr. Russell's response merely refers the court to Ms. Russell's

10   opposition to the WADOT Defendants' first motion for summary judgment and his

11   supplemental response does not mention his claims for breach of contract and of the

12   implied covenant of good faith and fair dealing at all.  (*See generally* Supp. Resp.)

13   Therefore, the court concludes that Mr. Russell has not met his burden to demonstrate a

14   genuine dispute of material fact and grants the WADOT Defendants' motion for

15   summary judgment on his breach of contract and good faith and fair dealing claims.

16                    *b.    Unjust Enrichment*

17        Mr. Russell alleges that WADOT was unjustly enriched as a result of its "unfair

18   and deceptive acts and practices."  (3d Am. Compl. ¶¶ 15.1-15.4.)  To prevail on an

19   unjust enrichment claim, the plaintiff must show that "(1) the defendant receive[d] a

20   benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances

21   make it unjust for the defendant to retain the benefit without payment."  *Young v. Young*,

22   191 P.3d 1258, 1262 (Wash. 2008).  A plaintiff cannot pursue an unjust enrichment claim

where a contract governs the conduct at issue.  *See Beck v. U.S. Bank Nat'l Ass'n*, No. C17-0882JLR, 2017 WL 6389330, at *6 (W.D. Wash. Dec. 14, 2017) (citing *MacDonald v. Hayner*, 715 P.2d 519, 522 (Wash. Ct. App. 1986)).

The WADOT Defendants argue that Mr. Russell cannot meet this burden because "there is nothing unjust about enforcing a valid deed of trust."  (MSJ at 25-26.)  As noted above, Mr. Russell's response merely refers the court to Ms. Russell's opposition to the WADOT Defendants' first motion for summary judgment, and his supplemental response does not mention the claim at all.  (*See generally* Resp.; Supp. Resp.)  Therefore, the court concludes that a reasonable jury could not find in Mr. Russell's favor on the unjust enrichment claim and grants the WADOT Defendants' motion for summary judgment.

     *c.* *Accounting*

To state a cause of action for an accounting, a plaintiff must first establish that "a fiduciary relation existed between the parties, or that the account is so complicated that it cannot be conveniently taken in an action at law."  *Hoyte v. Recontrust Co. N.A.*, No. C11-5389BHS, 2011 WL 2670116, at *3 (W.D. Wash. July 7, 2011) (quoting *Washington v. Taylor*, 362 P.2d 247, 253 (Wash. 1961)).

The WADOT Defendants argue that Mr. Russell cannot make either showing because a lender is not a fiduciary of its borrower and the calculation of the debt is straight forward.  (MSJ at 26.)  Again, Mr. Russell's response merely refers the court to Ms. Russell's opposition to the WADOT Defendants' first motion for summary judgment and his supplemental response does not mention the accounting claim at all.  (*See generally* Resp.; Supp. Resp.)  The court concludes that the WADOT Defendants have

1   met their burden to demonstrate that they are entitled to judgment as a matter of law.

2   First, in Washington, a lender such as WADOT is not a fiduciary of its borrower unless a

3   special relationship exists between the parties.  *See Barnett v. T.D. Escrow Servs., Inc.*,

4   No. C05-0799JLR, 2005 WL 1838623, at *2 (W.D. Wash. Aug. 1, 2005) (citing *Miller v.*

5   *U.S. Bank of Wash., N.A.*, 865 P.2d 536, 543 (Wash. Ct. App. 1994)).  Mr. Russell has

6   not directed the court to evidence that Ms. Russell had such a relationship with WADOT.

7   (*See generally* Resp.; Supp. Resp.)  Second, Mr. Russell has not shown that Ms. Russell's

8   account with WADOT was particularly complicated compared to a typical residential

9   loan arrangement.  (*See* Resp.; Supp. Resp.)  Therefore, the court grants the WADOT

10  Defendants' motion for summary judgment on the accounting claim.

11          5.      Attorneys' Fees

12          The WADOT Defendants seek an award of attorneys' fees and costs pursuant to

13  paragraph 11 of Ms. Russell's second loan agreement, paragraph 10 of the promissory

14  note associated with Ms. Russell's second loan, and paragraph 26 of the second DOT.

15  (MSJ at 27.)  Mr. Russell did not respond to the WADOT Defendants' request.  (*See*

16  *generally* Resp; Supp. Resp.)

17          Paragraph 11 of the second loan agreement provides, in relevant part,

18          In the event any legal action is commenced to construe or enforce any of the
            terms and provisions of this Agreement, the prevailing party in such litigation
19          shall be entitled to recovery of reasonable attorneys' fees and all court costs
            as well as the fees and expenses of certified public accountants and other
20          experts.

21  (2d Loan Agreement at 84.)  Paragraph 10 of the second note provides, in relevant part:

22

1

> If Maker or Holder sues to enforce this Note or obtain a declaration of its rights hereunder, the prevailing party in any such proceeding shall be entitled to recover its reasonable attorneys' fees and costs incurred in the proceeding . . . from the non-prevailing party.

2

3

(2d Note at 88.)  Finally, paragraph 26 of the second DOT provides, in relevant part:

4

5

> If Beneficiary institutes any suit or action to enforce any of the terms of this Deed of Trust, or commences a non-judicial foreclosure, through the Trustee, the Beneficiary shall be entitled to recover reasonable attorneys' fees and expenses in the non-judicial foreclosure as well as at trial and on any appeal.

6

7

(2d DOT at 99.)

8

Having reviewed these agreements, the court concludes that the WADOT

9

Defendants are entitled to reasonable prevailing party attorneys' fees and costs.

10

Accordingly, the court grants the WADOT Defendants' request for reasonable attorneys'

11

fees and costs, to be quantified in a motion filed within 14 days after entry of final

12

judgment in this case.  *See* Fed. R. Civ. P. 54(d)(2)(B).

13

6.     Declaratory Relief

14

The WADOT Defendants do not move for summary judgment on Mr. Russell's

15

claims for declaratory relief.  (*See generally* MSJ; *see* 3d Am. Compl. ¶¶ 16.4-16.6.)

16

Requests for declaratory judgment that merely impose the remedies provided for in other

17

claims are duplicative, however, and may be dismissed on that basis.  *Hold Sec. LLC v.*

18

*Microsoft Corp.*, 705 F. Supp. 3d 1231, 1246 (W.D. Wash. 2023) (citing *Swartz v.*

19

*KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007)).  Therefore, the court orders Plaintiffs to

20

show cause why the court should not award summary judgment to the WADOT

21

Defendants on requests for declaratory relief that are related to the claims that the court

22

has dismissed in this order.

7. <u>Injunction</u>

In the conclusion of their motion, the WADOT Defendants ask the court to dissolve the order enjoining the trustee's sale of the Greenwood Property and issue an order "directing the Clerk of King County to disburse the funds deposited into the court registry to them so that those funds can be applied to the loan." (MSJ at 27.) The WADOT Defendants, however, do not provide any legal authority or argument in support of their request for such an order. (*See generally id.*) The court declines to do the WADOT Defendants' work for them. Therefore, the court denies the WADOT Defendants' request to dissolve the state court's injunction without prejudice to raising the issue in a subsequent motion.

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS in part the WADOT Defendants' motion for summary judgment (Dkt. # 88) and DISMISSES the following claims against the WADOT Defendants with prejudice: (1) claims for violations of TILA, RESPA, HOEPA, and the ECOA; (2) claims for violation of the usury statute, the DTA, the WCLA, and the WCPA; and (3) claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and accounting. The court also GRANTS Defendants' request for an award of reasonable attorneys' fees and costs, to be quantified in a motion filed within 14 days of entry of final judgment. The motion shall be noted as a 21-day motion in accordance with Local Civil Rule 7(d)(3). *See* Local Rules W.D. Wash. LCR 7(d)(3).

1   The court DENIES the WADOT Defendants' request to dissolve the state-court

2   injunction and order the Clerk of King County to disburse funds, without prejudice to

3   renewing that request by no later than **October 23, 2024**.  The motion shall be noted as a

4   21-day motion in accordance with Local Civil Rule 7(d)(3).  *See id.*

5   Mr. Russell is ORDERED to show cause, by no later than **October 23, 2024**, why

6   the court should not award summary judgment to the WADOT Defendants on any claims

7   for declaratory relief related to the claims dismissed in this order.  The length of Mr.

8   Russell's response shall be limited to 2,100 words.  Failure to respond to this order to

9   show cause will result in the court dismissing with prejudice Mr. Russell's claims for

10  declaratory relief related to the claims dismissed in this order.

11  The NCP Defendants and the Lindstrom Defendants may file renewed motions for

12  summary judgment, if any, by no later than **November 13, 2024**.  The motions shall be

13  noted as 28-day motions in accordance with Local Civil Rule 7(d)(4).  *See id.* LCR

14  7(d)(4).

15  Dated this 9th day of October, 2024.

16

17

18  JAMES L. ROBART
    United States District Judge

19

20

21

22

ORDER - 56