UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PATRIC RUSSELL,                          CASE NO. C22-0531JLR

                        Plaintiff,       ORDER

        v.

WADOT CAPITAL, INC., et al.,

                        Defendants.

## I.    INTRODUCTION

Before the court are motions for summary judgment filed by (1) Defendants Todd
Lindstrom Corporation ("Lindstrom Corp."), Todd Lindstrom, and Tia Lindstrom
(together, the "Lindstrom Defendants") (Lindstrom MSJ (Dkt. # 122); Lindstrom Reply
(Dkt. # 138)); and (2) Defendants National Capital Partners, d/b/a Capital Compete
("NCP"), Jared Ekdahl, and Jane Doe Ekdahl (together with NCP, the "NCP
Defendants") (NCP MSJ (Dkt. # 126); NCP Reply (Dkt. # 140)).  Plaintiff Patric Russell,
as administrator and successor of the estate of deceased former Plaintiff Petra Russell,

1    opposes the motions (Lindstrom Resp. (Dkt. # 131); NCP Resp. (Dkt. # 135)) and moves

2    to strike portions of the Lindstrom Defendants' reply (Lindstrom Surreply (Dkt. # 142)).

3    The court has considered the motions, the parties' submissions, the relevant portions of

4    the record, and the governing law.  Being fully advised,[1] the court GRANTS the motions

5    for summary judgment.

6                                    **II.    BACKGROUND**

7              This matter arises from two loans that Petra Russell—Mr. Russell's mother and

8    the original plaintiff in this matter—obtained from Defendant WADOT Capital, Inc.

9    ("WADOT") in 2018 and 2019.  (*See generally* 3d Am. Compl. (Dkt. # 86).)  Each loan

10   was secured by a deed of trust on a home Ms. Russell owned at 146 N. 83rd Street in the

11   Greenwood neighborhood of Seattle, Washington (the "Greenwood Property").  (*Id.*)

12   The court set forth the factual and procedural background of this matter in detail in its

13   October 9, 2024 order granting in part and denying in part the WADOT Defendants'[2]

14   motion for summary judgment.  (10/9/24 Order (Dkt. # 111) at 2-17.)  The court assumes

15   the reader is familiar with that order and therefore focuses below on the background

16   relevant to the motions now before it.

17   **A.    Factual Background**

18             Mr. Ekdahl is the owner and principal of NCP, a private real estate loan broker

19   which does business under the tradename "Capital Compete."  (Ekdahl Decl. (Dkt. ## 95

20   _____

21        [1] No party requests oral argument and the court concludes that oral argument would not
     assist it in its disposition of the motions.  *See* Local Rules W.D. Wash. LCR 7(b)(4).

22        [2] The WADOT Defendants are WADOT, Erik Egger, Nicole House, Michael White,
     Steven White, HMJOINT, LLC ("HMJOINT"), Michele Chaffee, and Lisa Hallmon.

1    (sealed); 99 (redacted)) ¶ 2; Lindstrom Decl. (Dkt. # 97) ¶ 4.)  Capital Compete deals

2    exclusively with business and commercial loans, including loans for residential properties

3    used for business or commercial purposes such as investment or rental.  (Ekdahl Decl.

4    ¶ 3; Lindstrom Decl. ¶ 5.)  It does not handle consumer loan transactions or

5    owner-occupied properties and is not licensed to do so.  (Ekdahl Decl. ¶ 3; Lindstrom

6    Decl. ¶ 5.)  Capital Compete receives a commission of between one and four percent of

7    loan proceeds when a loan is funded.  (Ekdahl Decl. ¶ 4.)

8        Mr. Lindstrom is the owner, sole officer, and sole shareholder of Lindstrom Corp.

9    (Lindstrom Decl. ¶ 2.)  Between March 2016 and February 2019, Lindstrom Corp. was

10   an independent contractor for Capital Compete.  (*Id.* ¶¶ 6-7.)  Mr. Lindstrom is not

11   licensed to broker consumer loans.  (*Id.* ¶¶ 7, 19.)  Below, unless otherwise specified, the

12   court refers to Mr. Lindstrom, Lindstrom Corp., Mr. Ekdahl, and NCP collectively as

13   "Capital Compete."[3]

14       Ms. Lindstrom is Mr. Lindstrom's wife.  (*Id.* ¶ 3.)  She has no ownership interest

15   in Lindstrom Corp. and no role in its management or operations.  (*Id.*)  She was not

16   personally involved in with NCP, Ms. Russell, or the loans at issue in this case.  (*Id.*; *see*

17   *generally* 3d Am. Compl. (making no allegations regarding Ms. Lindstrom's conduct).)

18

19

20       [3] Mr. Russell argues that the court must deny the motions because there are disputes of fact regarding "whether [Lindstrom Corp.] transacted business as NCP or [i]ndependently." (*See*

21   Lindstrom Resp. at 10-11; *see generally* NCP Resp. (arguing that "whether the subject actions were ultimately done by the Lindstrom or NCP entity is a factual dispute").)  For the purpose of this order, the court assumes, but does not decide, that the Lindstrom Defendants and the NCP

22   Defendants can each be held responsible for the actions of the other.

1          1.    Ms. Russell's First Loan

2          In late 2017, Ms. Russell had filed a Chapter 13 bankruptcy petition and was

3   facing a January 12, 2018 foreclosure sale of the Greenwood Property.  (Lindstrom Decl.

4   ¶ 17; *see* 10/9/24 Order at 2-6 (discussing events preceding Ms. Russell's first loan).)  On

5   November 7, 2017, Ms. Russell called Capital Compete and spoke with Mr. Lindstrom

6   and Mr. Ekdahl.  (Ekdahl Decl. ¶ 5; *see also* 12/5/24 Patric Russell Decl. (Dkt. # 133)

7   ¶ 10.[4])  She explained that she needed an urgent cashout loan to pay off a judgment and

8   to make repairs to the Greenwood Property so that she could rent it out.  (Ekdahl Decl.

9   ¶ 5.)  The next day, Mr. Ekdahl emailed Ms. Russell a list of items Capital Compete

10  required to obtain pre-approval for her loan.  (*Id.* ¶ 6, Ex. 1.)  On November 10, 2017,

11  Ms. Russell provided Capital Compete a packet of documents relating to the Greenwood

12  Property and a home she owned at 635 NW 82nd Street in Seattle's Ballard neighborhood

13  (the "Ballard Property").  (*Id.* ¶ 7, Ex. 2.)  The packet included a document stating, with

14  respect to the Greenwood Property, "THIS ADDRESS NEEDED 4 WINDOWS

15  REPLACEMENT TO BE ABLE TO RENT IT OUT."  (*Id.* at 24.[5])

16

17

18      ⁴ Mr. Russell's declaration and response briefs include numerous representations about
19  statements Ms. Russell made to Mr. Lindstrom and Mr. Ekdahl and statements those Defendants
    made to Ms. Russell.  (*See, e.g.*, 12/5/24 Patric Russell Decl. ¶¶ 11-14, 16-23; Lindstrom Resp.
20  at 3-8.)  As the court has held, such statements are inadmissible hearsay because Mr. Russell
    lacks personal knowledge of the statements, seeks to admit them for the truth of the matters
21  asserted therein, and no hearsay exception applies.  (10/9/24 Order at 18-22.)  The court does not
    include inadmissible hearsay in its recitation of background facts.

22      ⁵ The court refers to the page number in the CM/ECF header when citing exhibits to
    declarations.

On November 11, 2017, Ms. Russell completed a loan application in which she identified the Ballard Property as her "Present Address" and the Greenwood Property as her "Former Address." (*Id.* ¶ 8, Ex. 3 at 29.) On November 14, 2017, Ms. Russell completed a request for a title report for the Greenwood Property in which she identified her mailing address as the Ballard Property. (*Id.* ¶ 9, Ex. 4 at 42.) On November 15, 2017, Ms. Russell sent Mr. Ekdahl an email message in which she stated that the loan was "need[ed] to repair the house" and explained that after she paid $250,000 in attorneys' fees and made improvements, "she [could] rent out the house." (*Id.* ¶ 10, Ex. 5 at 44-45.) Mr. Ekdahl states that based on this correspondence, he "had no doubt" that the Greenwood Property was a vacant investment property and that the Ballard Property was Ms. Russell's primary residence. (*Id.* ¶ 11.) Mr. Lindstrom also avers that Ms. Russell represented to him throughout the loan application process that she resided at the Ballard Property and did not claim that she or anyone else lived at the Greenwood Property. (Lindstrom Decl. ¶ 18; *see also id.* ¶ 19 (stating that he would not have brokered the loans if Ms. Russell had disputed that the Greenwood Property was an investment property).)

Capital Compete solicited loan offers from at least five potential lenders, including WADOT. (Ekdahl Decl. ¶ 12.) On November 27 and 28, 2017, Capital Compete obtained conditional loan approvals ("CLAs") from WADOT for loans of $300,000 and $350,000 at 12.5% interest. (*Id.* ¶ 13, Exs. 6-7.) Both CLAs indicated that the approval "assumes business/investment use[.]" (*Id.*) Ms. Russell submitted WADOT's $300,000

CLA with her successful request to dismiss her pending bankruptcy case.  (*See* 10/9/24 Order at 8.)

Mr. Ekdahl discussed the loan application with Ms. Russell on December 20, 2017, and sent a follow-up email the next day.  (Ekdahl Decl. ¶ 14, Ex. 8; *see also* 3d Am. Compl. at 77-79 (copy of the same email thread cited by Mr. Russell).)  Mr. Ekdahl warned Ms. Russell that Capital Compete

> really need[s] the signed CLA back today for our lender to proceed to work on your loan assuring we get your loan funded before the deadline.  We do NOT have ANY more room for further delays, otherwise, we may not be able to close by the deadline if we encounter any more issues.

(Ekdahl Decl. ¶ 14, Ex. 8.)  In the end, WADOT approved a $350,000 loan (the "First Loan"), which closed on January 9, 2018—just three days before the scheduled foreclosure sale.  (*Id.* ¶ 15.)  At closing, Ms. Russell executed a number of documents confirming that she intended to use the loan proceeds for business or investment purposes and that the Ballard Property was her primary residential address.  (*See* 10/9/24 Order at 9-10 (listing these documents).)  Capital Compete received a commission of $12,250.00 when the loan was funded.  (Ekdahl Decl. ¶ 17, Ex. 9 (settlement statement).)

2.     <u>Ms. Russell's Second Loan</u>

Mr. Ekdahl expected that Ms. Russell would use the proceeds from the first loan to repair the Greenwood Property and then either rent it out and obtain a new loan with more favorable terms or sell it and pay off her debts.  (*Id.* ¶ 18.)  Instead, on September 28, 2018, Ms. Russell contacted Capital Compete to inquire about obtaining a construction loan to "turn the property into a townhouse."  (*Id.* ¶ 19, Ex. 10.)

1    In November 2018, Capital Compete reached out to at least five lenders regarding

2    a refinance of Ms. Russell's First Loan.  (*Id.* ¶ 20; *see also* Lindstrom Decl. ¶ 10 (stating

3    Mr. Lindstrom reached out to at least six lenders, including WADOT).)  On November

4    16, 2018, Mr. Lindstrom forwarded to Ms. Russell a CLA from Velocity Mortgage

5    Capital ("Velocity") for a 30-year loan with a three-year fixed rate of 7.74% and an

6    adjustable rate thereafter.  (Ekdahl Decl. ¶ 21, Exs. 11 (correspondence with Velocity),

7    12 (correspondence with Ms. Russell).)  On November 21, 2018, Mr. Lindstrom

8    responded to questions Ms. Russell had sent to him by email the previous day.  (*Id.* ¶ 20,

9    Ex. 12.)  In her email, Ms. Russell stated, "I am not comfortable to take this loan as a

10   business loan." (*Id.* at 64.)  In response, Mr. Lindstrom explained,

11
12       In private money lending, they are all considered 'business loans'.  Your loan
         with WADOT was also considered a business loan.  This is because the
         property is an investment property and not used for your personal residence.
13       The[re] are restrictions against using these types of loans for your primary
         residence.  This is why the loan must be considered a business loan.

14   (*Id.* at 65.)  Ms. Russell also asked if she could "borrow from Wadot again because they

15   know [her.]"  (*Id.*)  Mr. Lindstrom responded,

16       We could, however WADOT does not have a long term program.  Their
         maximum term is 24 months.  However, if you would like to refinance with
17       them we could do that.

18   (*Id.*)  Mr. Lindstrom confirmed that the loan Velocity offered was a 30-year loan with

19   three years of fixed-rate interest, and explained that an eight-year fixed-rate loan for a

20   higher interest rate was also available.  (*Id.* at 65.)

21       In an email on November 23, 2018, Ms. Russell told Capital Compete that she

22   hoped they could "help [her] feel comfortable" about the Velocity loan.  (4/11/24

ORDER - 7

1    McIntosh Decl. (Dkt. # 89) ¶ 4, Ex. C at 27.)  Capital Compete asked what would make

2    her feel comfortable.  (*Id.*)  It informed her that it "do[es] not do conventional lending"

3    but instead did "private money loans that eliminates [sic] much of the paperwork and

4    guidelines that a conventional bank would require."  (*Id.*)  Ms. Russell wrote that she

5    would be comfortable if the loan did not charge for prepayment and that she did "not

6    wish to sign off foregoing certain protections for consumer [sic]."  (*Id.* at 28.)  Capital

7    Compete replied that Ms. Russell was "not giving up any consumer rights" and asked if

8    she wanted to move forward with the Velocity loan.  (*Id.*)

9        Rather than accept the Velocity loan, Ms. Russell informed Capital Compete that

10    she preferred to refinance her loan with WADOT.  (Ekdahl Decl. ¶ 22.)  Shortly

11    thereafter, Ms. Russell applied for and obtained her second loan (the "Second Loan")

12    from WADOT in the amount of $443,000.00.  (*Id.* ¶ 23.)  During the application process

13    and at closing on January 19, 2019, Ms. Russell again signed multiple documents

14    confirming that the loan was for business, investment, or commercial purposes and not

15    for personal purposes.  (*Id.* ¶ 24; *see* 10/9/24 Order at 13 (listing these documents).)

16    Capital Compete received a commission of $8,860.00 on the Second Loan.  (Ekdahl

17    Decl. ¶ 25, Ex. 13 (second settlement statement).)

18        3.    Lindstrom Corp. Ends Its Relationship with NCP

19        Lindstrom Corp. ended its relationship with NCP in February 2019, and Mr.

20    Lindstrom had no further contact with Ms. Russell thereafter.  (Lindstrom Decl. ¶ 25.)

21    After Lindstrom Corp.'s departure, NCP retained sole possession and control of the

22    "@capitalcompete.com" email domain and associated email accounts.  (*Id.* ¶ 12.)  In or

around February 2019, Mr. Lindstrom discovered that NCP had not registered the

tradename "Capital Compete" in Washington.  (*Id.* ¶ 26.)  That month, Lindstrom Corp.

registered the tradename "Capital Compete," but it allowed the registration to lapse in

November 2020.  (*Id.*)  Lindstrom Corp. did not conduct any business under the

tradename "Capital Compete" between February 2019 and November 2020.  (*Id.*)

<u>4.</u>    <u>Ms. Russell Defaults on the Second Loan</u>

In December 2019, Capital Compete communicated with Ms. Russell about

potentially refinancing the Second Loan because the February 1, 2020 payoff deadline

was fast approaching.  (Ekdahl Decl. ¶ 27; *see id.* ¶ 29, Ex. 16.)  It again solicited

proposals from at least five lenders.  (*Id.* ¶ 27.)  On January 2, 2020, Capital Compete

forwarded to Ms. Russell a CLA from Velocity for a 30-year loan with a three-year fixed

rate of 8.99%.  (*Id.* ¶ 28, Ex. 14.)  Ms. Russell signed the CLA.  (*Id.*)  On January 13,

2020, however, Velocity informed Mr. Ekdahl that it could not proceed with the proposed

loan.  (*Id.* ¶ 28, Ex. 15.)  Capital Compete then forwarded to Ms. Russell a revised

proposal from Velocity, which Ms. Russell and Mr. Ekdahl discussed by email between

January 24 and January 29, 2020.  (*Id.* ¶ 29, Ex. 16.)  In the end, Ms. Russell did not

proceeed with the Velocity loan, and she did not pay off the Second Loan before it

matured on February 1, 2020.  (*Id.* ¶ 30; 3/23/23 Egger Decl. (Dkt. # 38) ¶ 32.)  On

February 3, 2020, Ms. Russell asked Capital Compete to cease all futher efforts on her

behalf.  (Ekdahl Decl. ¶ 30.)

Ms. Russell did not respond to Capital Compete's attempts to reach her in April

and May 2020.  (*Id.* ¶ 31.)  On June 1, 2020, Mr. Ekdahl emailed WADOT's Nicole

1    House to enquire whether she was "able to send [a] default email to [Ms.] Russell and if

2    she replied." (4/29/24 Davidofskiy Decl. (Dkt. # 93) ¶ 13, Ex. 12 at 39.)  Ms. House

3    responded that she had sent the email but had not received a response. (*Id.*; *see also id.* at

4    40 (stating, on June 12, 2020, that WADOT still had not heard from Ms. Russell).)

5         On June 18, 2020, Mr. Ekdahl sent Ms. Russell an email warning her that

6    WADOT was beginning the process of foreclosing on the Greenwood Property. (Ekdahl

7    Decl. ¶ 31, Ex. 17.)  He offered to help her try to obtain a new loan. (*Id.* at 88.)  Again,

8    however, Ms. Russell did not respond to Mr. Ekdahl's email. (*Id.* ¶ 31.)  WADOT then

9    moved forward with the foreclosure of the Greenwood Property. (*See* 10/9/24 Order at

10    13-14 (summarizing foreclosure proceedings).)  Mr. Russell does not allege that the

11    Lindstrom Defendants or the NCP Defendants were involved in any way in the

12    foreclosure proceedings. (*See* 3d Am. Compl. ¶¶ 5.55-5.85.)

13    **B.    Procedural Background**

14         Ms. Russell filed her original complaint in King County Superior Court on

15    January 31, 2022, and amended her complaint in March 2022. (*See* Not. of Removal

16    (Dkt. # 1) ¶ 1.)  She challenged the terms of the WADOT loans; sought to enjoin the

17    foreclosure sale of the Greenwood Property; and alleged claims under state and federal

18    law against the WADOT Defendants, the Lindstrom Defendants, and Defendant NCW

19    Trustee Services, LLC ("NCW"). (*See generally* Am. Compl. (Dkt. # 1-1).)

20         On February 8, 2022, the superior court granted Ms. Russell's motion for a

21    temporary restraining order enjoining the sale of the Greenwood Property. (*See* TRO

22    Order (Dkt. # 3-33).)  On March 11, 2022, the superior court granted Ms. Russell's

1    motion for a preliminary injunction and enjoined the sale until further order.  (*See*

2    *generally* PI Order (Dkt. # 3-55).)  The preliminary injunction remains in place.  (*See*

3    11/15/24 Order (Dkt. # 128) (denying the WADOT Defendants' motion to dissolve the

4    preliminary injunction).)

5        HMJOINT removed the action to this court on April 20, 2022.  (*See generally* Not.

6    of Removal.)  On October 26, 2022, Ms. Russell amended her complaint a second time to

7    add claims against the NCP Defendants.  (2d Am. Compl. (Dkt. # 31).)  Ms. Russell

8    passed away in September 2023.  (*See* 1/9/24 Order (Dkt. # 84) (granting Mr. Russell's

9    motion to substitute).)  In January 2024, Mr. Russell substituted in as plaintiff and filed a

10   third amended complaint.  (*See id.*; 3d Am. Compl.)

11       On October 9, 2024, the court granted in part and denied in part the WADOT

12   Defendants' third motion for summary judgment.  (*See generally* 10/9/24 Order.)  The

13   court granted summary judgment in the WADOT Defendants' favor on all of Mr.

14   Russell's substantive claims against them but denied WADOT's request to dissolve the

15   state-court injunction.  (*Id.* at 55-56.)  Four rulings in that order are particularly relevant

16   to the motions now before the court.  First, the court held that statements Ms. Russell

17   made in her declarations and verified complaints are hearsay and inadmissible at

18   summary judgment if Mr. Russell offers them for the truth of the matters asserted therein.

19   (*Id.* at 18-22.)  Second, the court concluded, as a matter of law, that Ms. Russell's loans

20   were primarily for business, commercial, or investment purposes under federal and state

21   law, rather than primarily for personal, family, or household purposes.  (*Id.* at 26-35

22   (federal law), 41-43 (state law).)  Third, the court ruled, as a matter of law, that the

1   Greenwood Property was neither owner-occupied nor Ms. Russell's primary residence.

2   (*Id.* at 33-35, 45-48.)  Finally, the court declined to consider Mr. Russell's argument that

3   Capital Compete acted as WADOT's agent, but assumed for the purpose of deciding the

4   motion that WADOT had knowledge of the statements that Ms. Russell made to Capital

5   Compete.  (*Id.* at 30 n.10.)

6       The remaining Defendants filed motions for summary judgment on November 13,

7   2024.  (*See* Lindstrom MSJ; NCP MSJ; NCW MSJ (Dkt. # 124).)  Briefing on the

8   motions is complete and the motions are ripe for decision.[6]

9                       **III.    ANALYSIS**

10      The court begins by addressing Mr. Russell's assertion that Ms. Russell's hearsay

11  statements are admissible under Federal Rule of Evidence 106, then turns to the motions

12  for summary judgment.

13  **A.    Ms. Russell's Hearsay Statements Are Not Admissible Under Rule 106**

14      In its October 9, 2024 order, the court determined that Ms. Russell's out-of-court

15  statements in her declarations and the verified complaints are hearsay and thus

16  inadmissible at summary judgment if offered by Mr. Russell for the truth of the matters

17  asserted therein.  (10/9/24 Order at 18-22 (rejecting Mr. Russell's argument that the

18  statements are admissible under Federal Rules of Evidence 801(c), 803(3) and 807(a)).)

19

20

21

22

---

[6] The court will address NCW's motion for summary judgment in a separate order.

Mr. Russell now asserts that Ms. Russell's statements should be admitted under Federal

Rule of Evidence 106, which provides:

> If a party introduces all or part of a statement, an adverse party may require
> the introduction, at that time, of any other part—or any other statement—that
> in fairness ought to be considered at the same time.  The adverse party may
> do so over a hearsay objection.

Fed. R. Evid. 106.  The court concludes that Ms. Russell's statements in her declarations

and the verified complaints are not admissible under Rule 106.

The "rule of completeness" in Rule 106 "is designed to prevent the distortion that

inevitably results when only one portion of a [statement[7]] is admitted into evidence."

*United States v. Collicott*, 92 F.3d 973, 982-83 (9th Cir. 1996).  The rule of completeness

does not, however, "compel the admission of inadmissible hearsay evidence simply

because such evidence is relevant to the case."  *United States v. Lopez*, 4 F.4th 706, 715

(9th Cir. 2021) (citing *Collicott*, 92 F.3d at 983).  "Portions of a [statement] are

admissible under Rule 106 notwithstanding the bar on hearsay evidence when offered 'to

correct a misleading impression in the edited statement' introduced by an opposing

party."  *Id.* (quoting *United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014)).  "By

contrast, hearsay evidence is evidence offered 'to prove the truth of the matter asserted.'"

*Id.* (quoting Fed. R. Evid. 801(c)(2)).  Thus, Rule 106 "serves the purpose of correcting a

distortion created by an opposing party's misleading proffer of part of a [statement],"

while the hearsay rule "serves the purpose of barring introduction of hearsay evidence

---

[7] Rule 106 was amended effective December 1, 2023.  Previous versions of Rule 106
referred only to portions of writings or recordings.  The 2023 amendments do not limit
admissibility to writings or recordings.

proffered for its truth." *Id.*  As the advisory committee notes to the 2023 amendment make clear:

> The amendment does not give a green light of admissibility to all excised portions of statements.  It does not change the basic rule, which applies only to the narrow circumstances in which a party has created a misimpression about the statement, and the adverse party proffers a statement that in fact corrects the misimpression.

Fed. R. Evid. 106 advisory committee's note to 2023 amendment.  The advisory committee further instructs that:

> A party seeking completion with an unrecorded statement would of course need to provide admissible evidence that the statement was made. Otherwise, there would be no showing that the original statement is misleading, and the request for completion should be denied.

*Id.*

Here, Mr. Russell has not identified any misleadingly edited statements offered by the Lindstrom Defendants or NCP Defendants in support of their motions, nor has he proffered portions of such statements that should be introduced to correct the purportedly misleading edits or shown with admissible evidence that the statements he seeks to introduce were in fact made.  (*See* Lindstrom Resp. at 8-10.)  To the contrary, Mr. Russell simply cites Ms. Russell's declarations and the verified complaints as purported evidence of the content of Ms. Russell's discussions with Mr. Lindstrom and Mr. Ekdahl between 2017 and 2020.  (*See generally id.*)  Accordingly, the court denies Mr. Russell's request to admit Ms. Russell's hearsay statements pursuant to Rule 106 and does not consider those statements when evaluating the motions now before it.

1    **B.    Motions for Summary Judgment**

2        Mr. Russell raises claims against the Lindstrom Defendants and the NCP

3    Defendants for breach of contract and the implied covenant of good faith and fair dealing;

4    violations of Washington's Mortgage Broker Practices Act ("MBPA"), ch. 19.146 RCW;

5    violations of Washington's Consumer Protection Act ("WCPA"), ch. 19.86 RCW; breach

6    of fiduciary duty; and unjust enrichment.  The Lindstrom Defendants and the NCP

7    Defendants move for summary judgment on all of these claims.  (*See generally*

8    Lindstrom MSJ; NCP MSJ.)  For the reasons that follow, the court grants the motions.

9        1.    Standard of Review

10        Summary judgment is appropriate if the evidence viewed in the light most

11    favorable to the non-moving party shows "that there is no genuine dispute as to any

12    material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

13    56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when,

14    under the governing substantive law, it could affect the outcome of the case.  *Anderson v.*

15    *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists

16    when "the evidence is such that a reasonable jury could return a verdict for the

17    nonmoving party." *Id.*

18        To carry its burden, "the moving party must either produce evidence negating an

19    essential element of the nonmoving party's claim or defense or show that the nonmoving

20    party does not have enough evidence of an essential element to carry its ultimate burden

21    of persuasion at trial." *Jones v. Williams*, 791 F.3d 1023, 1030-31 (9th Cir. 2015)

22    (quoting *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir.

1    2000)).  If the moving party meets its burden of production, the burden then shifts to the

2    nonmoving party to identify specific facts from which a factfinder could reasonably find

3    in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

4    "This burden is not a light one."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th

5    Cir. 2010).  The party opposing the motion for summary judgment "must do more than

6    simply show that there is some metaphysical doubt as to the material facts."  *Scott v.*

7    *Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*

8    *Corp.*, 475 U.S. 574, 586 (1986)).  "Where the record taken as a whole could not lead a

9    rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

10   *Id.* (quoting *Matsushita*, 475 U.S. at 587).  The court is "required to view the facts and

11   draw reasonable inferences in the light most favorable to the [nonmoving] party."  *Id.* at

12   378 (internal quotations omitted).  It may not weigh evidence or make credibility

13   determinations.  *Anderson*, 477 U.S. at 249-50.

14       A "party asserting that a fact cannot be or is genuinely disputed must support the

15   assertion by . . . citing to particular parts of materials in the record[.]"  Fed. R. Civ. P.

16   56(c)(1)(A); *see also* Local Rules W.D. Wash. LCR 10(e)(6) ("Citations to documents

17   already in the record . . . must include a citation to the docket number and the page

18   number[.]").  Further, "[a]n affidavit or declaration used to support or oppose a motion

19   must be made on personal knowledge, set out facts that would be admissible in evidence,

20   and show that the affiant or declarant is competent to testify on the matters stated."  Fed.

21   R. Civ. P. 56(c)(4); *see also Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th

22   Cir. 2001) ("To be cognizable on summary judgment, evidence must be competent.").

1          2.    Tia Lindstrom

2          The court begins with the Lindstrom Defendants' motion for summary judgment

3   as to Mr. Russell's claims against Ms. Lindstrom.  (Lindstrom MSJ at 20-21.)  The

4   Lindstrom Defendants argue that such claims must be dismissed because Mr. Russell has

5   not alleged and cannot show that Ms. Lindstrom was involved in any way with Ms.

6   Russell's loans.  (Lindstrom MSJ at 20-21.)  They ask the court to issue sanctions against

7   Mr. Russell pursuant to Federal Rule of Civil Procedure 11 for continuing to pursue

8   claims against Ms. Lindstrom.  (*Id.* at 21; Lindstrom Reply at 3-4.)  Mr. Russell clarifies

9   that he named Ms. Lindstrom because "a marital community can be liable for the separate

10  torts of the spouse." (Lindstrom Resp. at 11-12; *see* 3d Am. Compl. ¶ 3.5 (alleging that

11  acts performed by Mr. Lindstrom were performed on behalf of himself, Capital Compete,

12  and the marital community).)  He also moves to strike the Lindstrom Defendants' request

13  for sanctions.  (*See generally* Lindstrom Surreply.)

14         Because it is clear that Mr. Russell brings no claims against Ms. Lindstrom

15  individually, the court grants the Lindstrom Defendants' motion for summary judgment

16  with respect to claims, if any, against Ms. Lindstrom in her individual capacity.  The

17  court denies Mr. Russell's motion to strike the Lindstrom Defendants' request for Rule

18  11 sanctions because the Lindstrom Defendants first raised that request in their opening

19  brief.  (*See* Lindstrom MSJ at 21.)  The court, however, denies the Lindstrom

20  Defendants' request for sanctions because (1) Mr. Russell named Ms. Lindstrom only

21  with respect to the Lindstroms' marital community and (2) the request is procedurally

22  improper under Federal Rule of Civil Procedure 11(c)(2).  *See* Fed. R. Civ. P. 11(c)(2).

<u>3.</u>     <u>Breach of Contract</u>

To prevail on a breach of contract claim, the plaintiff must prove:  (1) the existence of a valid contract between the parties, (2) the defendant's breach, and (3) damages.  *See Lehrer v. Wash. Dep't of Soc. & Health Servs.*, 5 P.3d 722, 727 (Wash. Ct. App. 2000).  "Federal courts regularly dismiss unadorned breach of contract claims where the claimant fails to cite the contractual provision that was allegedly breached." *Block Mining, Inc. v. Hosting Source, LLC*, No. C24-0319JLR, 2024 WL 3012948, at *10 (W.D. Wash. June 14, 2024) (compiling cases).

Mr. Russell argues that Capital Compete breached its "express promise to provide Ms. Russell with a 30-year fixed-rate loan upon expiration of the initial loan" and "wrongfully characterized" Ms. Russell's loans as commercial-purpose loans.[8] (Lindstrom Resp. at 18.)  Mr. Russell, however, does not direct the court to admissible evidence that Capital Compete in fact promised Ms. Russell that it would procure a 30-year fixed-rate loan or characterize her loans as personal-purpose loans.  (*See generally id.* (citing no competent evidence that Capital Compete made such promises); NCP Resp. (same).)  To the contrary, the admissible unrebutted evidence shows that Capital Compete did not deal in personal-purpose loans (*see* Ekdahl Decl. ¶ 3); that Ms. Russell rejected a 30-year loan offered by Velocity in favor of a shorter-term WADOT loan (*see id.* ¶¶ 20-23); and that Ms. Russell repeatedly affirmed that the loans were for a business

_____

[8] Mr. Russell again argues, as he did in opposing the WADOT Defendants' motion for summary judgment, that Ms. Russell's loans were primarily for a personal purpose.  (*See* Lindstrom Resp. at 12-16.)  The court has rejected this argument (*see, e.g.*, 10/9/24 Order at 31-33) and nothing Mr. Russell raises now convinces the court to change its ruling.

1    or investment purpose (*see, e.g.*, 10/9/24 Order at 9-10, 13).  Thus, these alleged

2    promises cannot form the basis of Mr. Russell's breach of contract claim.

3         Mr. Russell also alleges Capital Compete is liable for breach of contract as

4    WADOT's agent.  (*See* Lindstrom Resp. at 17, 19; 3d Am. Compl. ¶ 6.3.)  Assuming,

5    without deciding, that Capital Compete acted as WADOT's agent (*see* 10/9/24 Order at

6    30 n.10 (making the same assumption)), Mr. Russell's claim fails because WADOT itself

7    is not liable for breach of contract as a matter of law.  (*See id.* at 51 (granting the

8    WADOT Defendants' motion for summary judgment on Mr. Russell's breach of contract

9    claim).)  Accordingly, the court grants summary judgment to the Lindstrom Defendants

10   and NCP Defendants on Mr. Russell's breach of contract claim.

11   4.    Breach of the Implied Duty of Good Faith and Fair Dealing

12        The implied duty of good faith and fair dealing "obligates the parties to cooperate

13   with each other so that each may obtain the full benefit of performance."  *Badgett v. Sec.*

14   *State Bank*, 807 P.2d 356, 360 (Wash. 1991).  The duty "requires only that the parties

15   perform in good faith the obligations imposed by their agreement" and thus "arises only

16   in connection with terms agreed to by the parties."  *Id.*

17        Mr. Russell argues that Capital Compete breached its duty of good faith and fair

18   dealing by "mischaracteriz[ing]" the loans as "a business-purpose transaction, despite

19   knowing that Ms. Russell sought the loan for personal purposes" and "exploit[ing] . . .

20   Ms. Russell's lack of technical knowledge and reliance on their expertise."  (Lindstrom

21   Resp. at 18, 19.)  Mr. Russell again, however, fails to cite competent evidence that

22   Capital Compete engaged this alleged conduct, and he does not identify the contract

1    terms from which a duty to refrain from such conduct arose.  (*See generally id.*)

2    Accordingly, Mr. Russell has not shown a genuine dispute of material fact as to whether

3    Capital Compete "failed to perform in good faith" an "obligation imposed" under the

4    contract.  *See Badgett*, 807 P.2d at 360.  Therefore, the court grants the Lindstrom

5    Defendants' and NCP Defendants' motions for summary judgment on Mr. Russell's

6    claim for breach of the duty of good faith and fair dealing.

7         5.    Mortgage Broker Practices Act

8         The MBPA prohibits mortgage brokers from engaging in certain unfair or

9    deceptive practices.  *See* RCW 19.146.0201.  The statute defines "mortgage broker" as

10   "any person who . . . for compensation or gain . . . (a) assists a person in obtaining or

11   applying to obtain a residential mortgage loan . . . or (b) holds himself or herself out as

12   being able to assist a person in obtaining or applying to obtain a residential mortgage

13   loan[.]"  RCW 19.146.010(14).  "[A] person 'holds himself or herself out' by advertising

14   or otherwise informing the public that they engage in any of the activities of a mortgage

15   broker[.]"  WAC 208-660-109.  A "residential mortgage loan" is defined, in relevant part,

16   as a "loan *primarily for personal, family, or household use*" secured by a mortgage or

17   deed of trust on residential real estate.  RCW 19.146.010(19) (emphasis added).

18        Because Ms. Russell's loans were primarily for a business purpose rather than a

19   personal purpose (*see* 10/9/24 Order at 27-35, 41-43), Capital Compete did not assist Ms.

20   Russell in obtaining a "residential mortgage loan" and, as a result, cannot be a "mortgage

21   broker" under RCW 19.146.010(14)(a).  Therefore, to survive summary judgment, Mr.

22   Russell must establish a genuine dispute of material fact as to whether Capital Compete

ORDER - 20

1    held itself out as being able to assist a person in applying for or obtaining a "residential

2    mortgage loan" under RCW 19.146.010(14)(b).

3          Mr. Russell asserts that Capital Compete did so by including the words "Money

4    Loans" and "Residential" in an advertisement that he states Ms. Russell found in a library

5    in November 2017:

6
7
8
9
10
11    
12
13

14    (Lindstrom Resp. at 20 & n.38 (citing 2/28/22 Petra Russell Decl. (Dkt. # 3-38) ¶ 2, Ex.

15    1); 12/5/24 Patric Russell Decl. ¶ 9 (highlighting in original).)  At the outset, the court

16    agrees with the NCP Defendants that the advertisement is not admissible.  (*See* NCP

17    Reply at 6.)  Ms. Russell cannot authenticate the advertisement because she is unable to

18    testify at trial about where and when she found it.  Mr. Russell's declaration does not

19    authenticate the advertisement because Mr. Russell asserts no basis for his own personal

20    knowledge regarding where and when Ms. Russell found the advertisement.  (*See* 12/5/24

21    Patric Russell Decl. ¶ 9.)  And although Mr. Russell asserts that the document is

22

ORDER - 21

1    admissible as a business record under Federal Rule of Evidence 803(6) (*see* Lindstrom

2    Resp. at 20 n.38), he offers no evidence that the business record hearsay exception

3    applies here.  *See* Fed. R. Evid. 803(6)(A)-(E) (listing requirements to admit a business

4    record); *Triplett-Hill v. Williams*, No. 2:16-cv-06196-CAS-GJSx, 2024 WL 5185310, at

5    *4 (C.D. Cal. Sept. 16, 2024) ("Facts supporting such admissibility must be supplied by a

6    custodian of records or other competent witness.").

7         Even if the advertisement were admissible, the fact that it includes the words

8    "Money Loans" and "Residential" does not, without more, establish a genuine dispute of

9    fact as to whether Capital Compete held itself out as offering to assist borrowers in

10   obtaining personal-purpose "residential mortgage loans" as defined by the MBPA.  As

11   the court observed in its October 9, 2024 order, a "residential" loan may be for either a

12   business purpose or a personal purpose.  (*See* 10/9/24 Order at 31-32 (holding that the use

13   of a Uniform Residential Loan Application was not probative evidence that Ms. Russell's

14   loans were obtained primarily for a personal purpose).)  Therefore, having viewed the

15   competent evidence in the record in the light most favorable to Mr. Russell, the court

16   concludes that no reasonable juror could find that Capital Compete is a "mortgage

17   broker" subject to the MPBA and grants the Lindstrom Defendants' and NCP

18   Defendants' motions for summary judgment on Mr. Russell's MBPA claim.

19        6.    Washington Consumer Protection Act

20        The WCPA prohibits "[u]nfair methods of competition and unfair or deceptive

21   acts or practices in the conduct of any trade or commerce." RCW 19.86.020.  To succeed

22   on a WCPA claim, the plaintiff "must establish (1) an unfair or deceptive act (2) in trade

1    or commerce (3) that affects the public interest, (4) injury to the plaintiff in his or her

2    business or property, and (5) a causal link between the unfair or deceptive act complained

3    of and the injury suffered." *Trujillo v. Nw. Tr. Servs., Inc.*, 355 P.3d 1100, 1107 (Wash.

4    2015); *see Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531,

5    535 (Wash. 1986).

6         Here, Mr. Russell asserts that Capital Compete violated the WCPA by

7    (1) violating the MBPA; (2) "mischaracterizing Ms. Russell's loan as a commercial

8    transaction despite her clear intent to obtain a loan for personal purposes[;]" (3) "coercing

9    [Ms. Russell] into signing documents that misrepresented her intent[;]" and

10   (4) "advertis[ing] a 6.99% interest rate in a manner that was misleading and constitutes

11   'bait and switch'[.]"  (Lindstrom Resp. at 21-22.)

12        The court can easily dispose of the first two grounds.  First, Mr. Russell's WCPA

13   claim based on alleged violations of the MBPA fails because, as discussed above, Capital

14   Compete was not subject to the MBPA.  And second, Mr. Russell has not directed the

15   court to competent evidence that Ms. Russell had a "clear intent to obtain a loan for

16   personal purposes" or that Capital Compete "rejected Ms. Russell's truthful statement

17   regarding the loan's purpose[.]"  (*Id.* at 21.)  Instead, Mr. Russell continues to rely

18   heavily on hearsay statements in Ms. Russell's declarations and his verified complaint.

19   (*See, e.g.*, *id.* at 2-8.)

20        Mr. Russell's third argument that Capital Compete "coerc[ed]" Ms. Russell to sign

21   documents that "misrepresented her intent" also is not supported by the evidence.  Mr.

22   Russell cites the following as evidence of Capital Compete's coercion and

1    "manipulation":  (1) a December 21, 2017 email from Mr. Ekdahl to Ms. Russell in

2    which Mr. Ekdahl expressed urgency to get a signed CLA to WADOT to ensure the loan

3    was funded before the foreclosure sale (Lindstrom Resp. at 4 (citing 3d Am. Compl. at

4    77-79)); (2) a January 4, 2018 email from Mr. Lindstrom to WADOT in which Mr.

5    Lindstrom stated, "I will have a business letter drafted for [Ms. Russell's] signature at

6    closing" (*id.* at 5 (citing 4/29/24 Davidovskiy Decl. ¶ 2, Ex. 1)); (3) a January 16, 2019

7    email in which Mr. Ekdahl instructed Ms. Russell to draft a business purpose letter

8    "following exactly what they are asking for, sign it and email it back to [Capital

9    Compete] ASAP" so that WADOT could fund her second loan (*id.* at 6 (citing 4/29/24

10   Davidovskiy Decl. ¶ 12, Ex. 11)); and (4) a follow-up email on January 18, 2019 in

11   which Mr. Ekdahl informed Ms. Russell that her draft letter "does not satisfy Wadots

12   [sic] condition" (*id.* (citing 4/29/24 Davidovskiy Decl. ¶ 9, Ex. 8)).  Mr. Russell also

13   "recall[s] that . . . Capital Compete would send [Ms. Russell] multiple papers to sign

14   quickly under time limit[.]"  (12/5/24 Patric Russell Decl. ¶ 17.)  The undisputed facts,

15   however, show that Ms. Russell and Capital Compete were facing tight deadlines to

16   finalize the First Loan before the January 12, 2018 foreclosure sale and the Second Loan

17   before the First Loan came due on February 1, 2019.  (*See* 10/9/24 Order at 6-13.)  And

18   absent competent evidence that Ms. Russell sought a personal-purpose loan, the court

19   cannot conclude that a reasonable jury could find in Mr. Russell's favor on his WCPA

20   claim based on Capital Compete's alleged coercion and manipulation of Ms. Russell.

21        Finally, Mr. Russell asserts that the 6.99% interest rate displayed in the

22   advertisement Ms. Russell found in November 2017 was a "bait and switch" because the

1    rate "was not offered to Ms. Russell." (Lindstrom Resp. at 21.)  Even if the

2    advertisement were admissible in the first instance, Mr. Russell has not pointed to

3    evidence that Ms. Russell qualified for the lower interest rate or that Capital Compete

4    failed to offer the lower rate to other borrowers or for other types of loans. (*See id.* at

5    21-22.)  Therefore, the court grants the Lindstrom Defendants' and NCP Defendants'

6    motions for summary judgment on Mr. Russell's WCPA claims.

7        7.    Breach of Fiduciary Duty

8        To prevail on a claim for breach of fiduciary duty, the plaintiff must show that the

9    defendant owed the plaintiff a fiduciary duty, the defendant breached that duty, the

10    plaintiff suffered an injury, and the breach of duty proximately caused the injury. *Miller*

11    *v. U.S. Bank of Wash., NA*, 865 P.2d 536, 543 (Wash. Ct. App. 1994).  The court

12    concludes that summary judgment is warranted because Mr. Russell cannot establish that

13    Capital Compete owed Ms. Russell a fiduciary duty.

14        First, Mr. Russell asserts that Capital Compete owed Ms. Russell a fiduciary duty

15    under the MPBA.  (Lindstrom Resp. at 23-24.)  As discussed above, however, Capital

16    Compete is not subject to the MBPA.  Therefore, it cannot owe a fiduciary duty to Ms.

17    Russell under that statute.

18        Second, Mr. Russell contends that Capital Compete owed Ms. Russell a fiduciary

19    duty pursuant to the Distressed Property Conveyances Act ("DPCA"), ch. 61.34 RCW.

20    (*Id.* at 25); *see* RCW 61.34.060 (imposing a fiduciary duty between a "distressed home

21    consultant" and a "distressed homeowner").  Capital Compete does not owe a fiduciary

22    duty to Ms. Russell under the DCPA, however, because Ms. Russell is not a "distressed

homeowner" as defined by that statute. The DCPA defines a "homeowner" as "a person who owns and has occupied a dwelling as his or her primary residence within one hundred eighty days" of a conveyance of the property. RCW 61.34.020(10). As the court concluded in its October 9, 2024 order, no reasonable juror could find, based on the competent evidence in the record, that Ms. Russell occupied the Greenwood Property as her primary residence during the relevant time frame. (10/9/24 Order at 45-48.) Thus, the DPCA, like the MBPA, does not impose a fiduciary duty on Capital Compete.

Finally, Mr. Russell argues that Capital Compete owed Ms. Russell a fiduciary duty due to a "special relationship" between them. (Lindstrom Resp. at 24-25.) Such a relationship may arise "when there is something in the particular circumstances which approximates a business agency, a professional relationship, or a family tie, something which itself impels or induces the trusting party to relax the care and vigilance which he otherwise should, and ordinarily would, exercise." *Alexander v. Sanford*, 325 P.3d 341, 365 (Wash. Ct. App. 2014) (quoting *Hood v. Cline*, 212 P.2d 110, 115 (Wash. 1949) (cleaned up)). "The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party." *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 935 P.2d 628, 634 (Wash. Ct. App. 1997) (citation omitted). "In other words, the plaintiff must show some dependency on his or her part and some undertaking by the defendant to advise, counsel and protect the weaker party." *Id.* (citation omitted). Evidence establishing a "lack of business expertise on the part of one party and a friendship between the contracting parties" or "[s]uperior knowledge and

1   assumption of the role of adviser" may support a fiduciary relationship.  *Liebergesell v.*

2   *Evans*, 613 P.2d 1170, 1176 (Wash. 1980) (internal citations omitted).  It is not enough

3   for the plaintiff to simply demonstrate a lack of sophistication or that they placed trust in

4   the defendant.  *In re Bryce*, 491 B.R. 157, 189 (Bankr. W.D. Wash. 2013).

5          Here, Mr. Russell asserts that Capital Compete owed Ms. Russell a fiduciary duty

6   because she "was a vulnerable borrower, who had recently faced bankruptcy, and spoke

7   little English[,]" and was "a senior citizen with limited financial and legal expertise" who

8   "relied entirely on [Capital Compete's] guidance to ensure the loan documents accurately

9   reflected her needs and intentions." (Lindstrom Resp. at 24.)  He also asserts that Capital

10  Compete's "repeated assurances that Ms. Russell should 'trust them' and that they would

11  secure a 30-year fixed-rate loan further demonstrate a breach of fiduciary duty." (*Id.*)  He

12  does not, however, direct the court to competent evidence that Capital Compete made

13  such assurances to Ms. Russell; undertook to advise, counsel and protect her; or

14  otherwise induced her to rely on its guidance.  (*See generally id.*; NCP Resp.)  As a

15  result, the court concludes that no reasonable juror could find a "special relationship"

16  between Capital Compete and Ms. Russell that imposed a fiduciary duty on Capital

17  Compete.  Therefore, the court grants the Lindstrom Defendants' and NCP Defendants'

18  motions for summary judgment on Mr. Russell's breach of fiduciary duty claim.

19          8.    Unjust Enrichment

20          Finally, to prevail on an unjust enrichment claim, a plaintiff must show that

21  "(1) the defendant receive[d] a benefit, (2) the received benefit is at the plaintiff's

22  expense, and (3) the circumstances make it unjust for the defendant to retain the benefit

without payment." *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008).  A plaintiff cannot, however, pursue an unjust enrichment claim where a contract governs the conduct at issue.  *See Beck v. U.S. Bank Nat'l Ass'n*, No. C17-0882JLR, 2017 WL 6389330, at *6 (W.D. Wash. Dec. 14, 2017) (citing *MacDonald v. Hayner*, 715 P.2d 519, 522 (Wash. Ct. App. 1986)).

Here, although Mr. Russell affirms that a contract existed between Ms. Russell and Capital Compete, he asserts, without citation to authority or evidence, that his unjust enrichment claim survives because "Defendants manipulated the loan process to secure fees and commissions at Ms. Russell's expense by misrepresenting the purpose of the loan, coercing her to sign fabricated 'business purpose' documents, and failing to provide the promised 30-year fixed-rate loan."  (*See* Lindstrom Resp. at 25.)  As discussed above, Mr. Russell has not directed the court to competent evidence from which a reasonable juror could find in his favor on any of these theories.  Accordingly, the court grants the Lindstrom Defendants' and NCP Defendants' motions for summary judgment on Mr. Russell's unjust enrichment claim.

## IV.    CONCLUSION

For the foregoing reasons, the court GRANTS the Lindstrom Defendants' and NCP Defendants' motions for summary judgment (Dkt. ## 122, 126).  The court DISMISSES with prejudice Mr. Russell's claims against the Lindstrom Defendants and the NCP Defendants for breach of contract and the implied covenant of good faith and fair dealing, violations of the Mortgage Broker Practices Act, violations of the Washington Consumer Protection Act, breach of fiduciary duty, and unjust enrichment.

The motions *in limine* filed by the Lindstrom Defendants and NCP Defendants (Dkt.

## 151, 152) are STRICKEN as moot.

Dated this 29th day of January, 2025.

JAMES L. ROBART
United States District Judge